### Spangler, Appellant, *v.* Helm's New York-Pittsburgh Motor Express.

Argued May 6, 1959. Before JONES, C.J., BELL, MUSMANNO, JONES, COHEN and BOK, JJ.

*L. E. Meyer,* with him *J. R. Whitman,* and *Meyer, Brubaker & Whitman,* for appellant.

*Clarke McA. Seltzer,* with him *George L. Holstein, Jr.,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, July 2, 1959:

Mrs. Regina E. Spangler, 36 years of age, was killed in an automobile accident, caused by the negligence of the driver of a tractor-trailer owned by Helm's New York-Pittsburgh Motor Express, the defendant in this case. Clyde G. Spangler, husband of the decedent and now administrator of her estate, brought actions against the defendant under the Wrongful Death and Survival Acts. The jury returned a verdict in his favor in the sum of $679.54 in the Wrongful Death Act action and $45,380 under the Survival Act, for a total of $46,059.54.

The Trial Judge declared the verdict excessive and ordered a new trial unless the plaintiff agreed to file a remittitur in the amount of $17,861.04, thus reducing the verdict to $28,198.50. The plaintiff refused to file such a remittitur and this appeal followed.

The decedent Mrs. Spangler, who, at the time of her death, had a life expectancy of 32.59 years, was sur-

vived by her husband and three children, aged respectively 14 years, 13 years, and 5 months. The only question on this appeal must be stated in terms which might seem materialistic, namely: What did Mrs. Spangler mean to these people in terms of money? Naturally, no husband and no children see in the person dearest to them a money equivalent, and, during life, such an evaluation would be unqualifiedly brutal and offensive. However, with death, problems arise which must be solved, harsh and heartrending as they may be. Thus, as Mr. Spangler and his children now face a future with the main pillar of their family structure missing, the question inescapably follows: How much do they need to supplant that pillar?

To begin with, there was very definite physical work performed by Mrs. Spangler, for which no sums were drawn from the family budget. Money is now needed to pay for those services. Mrs. Spangler did the household work: she washed, ironed, cooked, and sewed. She did all the housecleaning, made some of the children's clothing, helped her husband paint the house, she put together draperies and rugs. All these services can be translated into pecuniary values because one can presumably go into the labor market and find a housekeeper to perform those labors. But the amount paid to such a housekeeper would not compensate for Mrs. Spangler's displacement. There are services performed by a wife-mother which no housekeeper can supply.

The fact that there is no mathematical formula whereby compassionately bestowed benefits can be converted into a precise number of bank notes does not mean that the tortfeasor will be excused from making suitable reimbursement for their loss. The law commands that the wrongdoer pay what justice requires and common sense dictates. The man who accomplishes a great wrong cannot escape accountability on the basis

that his responsibility cannot be computed to the last dollar and penny.

The evidence reveals that Mrs. Spangler was unstintingly devoted to her family. The record shows that her loyalty was expressed in an incessant activity, tireless energy, and never-flagging concern. She took the children to church regularly, she added to their religious instruction, she prayed with them, she accompanied them to baseball games and on fishing trips. All these things—such as companionship, comfort, society, guidance, solace, and protection which go into the vase of family happiness—are the things for which a wrong-doer must pay when he shatters the vase.

The illustrious Justice AGNEW well expressed the rule here involved when he said in the case of *Pennsylvania Railroad Co. v. Goodman*, 62 Pa. 329, 339: "The frugality, industry, usefulness, attention, and tender solicitude of a wife and the mother of children, surely make her services greater than those of an ordinary servant, and therefore worth more. These elements are not to be excluded from the consideration of a jury in making a mere money estimate of value."

It is not acceptable to say that a jury has no comptometer with which to total up values assignable to economy, industry, attention and tender solicitude. Difficulty of computation is not a barrier to full recovery. The commission of a wrong carries with it the duty to make amends. And if the mending process is additionally expensive because of problems encountered in ascertaining the cost of the rehabilitating agents, that process becomes part of the obligation the tortfeasor must assume.* As between the innocent victim

---

* In *Bigelow v. RKO*, 327 U.S. 251, 265, the Supreme Court of the United States, speaking through Chief Justice STONE, said: "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."

of a wrong and the person who accomplished the wrong, the law imposes on the malfeasor the obligation to make the victim whole in every phase in which the victim has suffered, to the extent that rehabilitation is possible in terms of money. And when the jury has made its calculation and has spoken that calculation through its verdict, the verdict is not to be disturbed unless there comes to light some misconduct or misapprehension on the part of the jury, none of which, of course, is evident in the case at bar.

The celebrated Chancellor KENT spoke exceedingly well on this subject: "The question of damages was within the proper and peculiar province of the jury. It rested in their sound discretion, under all the circumstances of the case, and unless the damages are so outrageous as to strike every one with the enormity and injustice of them, and so as to induce the court to believe that the jury must have acted from prejudice, partiality or corruption, we cannot, consistently with the precedents, interfere with the verdict. It is not enough to say that in the opinion of the court, the damages are too high, and that we would have given much less. It is the judgment of the jury, and not the judgment of the court, which is to assess the damages in actions for personal torts and injuries . . . The damages, therefore, must be so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, or corruption. In short, the damages must be flagrantly outrageous and extravagant, or the court cannot undertake to draw the line; for they have no standard by which to ascertain the excess." *Coleman v. Southwick,* 9 Johnson (N.Y.) 45, 6 Am. Dec. 253 (1812).

There was another important item which the jury in this case considered in arriving at their verdict.

Mrs. Spangler was obviously one of those wife-mothers who give heart, body, and soul to the family. She not only performed the household duties already described, but, in addition, in order to augment the family income, she took up part-time employment in a shoe factory, earning 95 cents an hour. The personnel manager of the shoe company which employed her, testified that for the 26 weeks preceding the birth of her last child, Mrs. Spangler earned $1062.82. He said further that her work was excellent and that had she lived and continued to work, she would at the time of the trial, have been earning $1.25 an hour. Thus, considering the decedent's long life expectancy, the jury was justified in returning a not inconsiderable sum on the basis of lost earning power alone.

The lower Court seemed to be of the impression that because Mrs. Spangler was part-time employed she could not give to her home the attention which could be expected of a home-staying housewife. Ordinarily this might be true, but the record would not indicate that it was true here. Nor is it true in most cases where a mother lives, breathes and works only for the comfort, the honor, and the happiness of her family. What might be drudgery to a self-pitying woman is only a glorious challenge to the devoted wife-mother. The jury was justified in concluding that Mrs. Spangler was that kind of a woman.

As already stated, the Trial Judge found that the jury's verdict was $17,860.04 too much. He said that when the jury returned the verdict it shocked his sense of justice. He did not explain how his sense of justice was shocked to the precise extent of $17,860.04. He filed an Opinion of 26 pages, but nowhere did he offer an explanation as to how and wherein his sense of justice was shocked. While a Trial Judge is allowed considerable latitude in the matter of awarding new

trials, we have often said that we do not abdicate our right to review the record to determine whether the cancellation of a jury's verdict is warranted under all the circumstances of the case. *Glaister v. Eazor Express*, 390 Pa. 485.

We have also said that it is not enough for the Trial Judge merely to say that a new trial is required because of his shocked sense of justice. The phrase "shocked sense of justice" cannot be used as an all-enveloping cloak to cover every type of drastic action which may be undertaken by a trial court. While there is no standard voltage for judicial shock, the situation which so upsets the judge's equanimity as to justify the upsetting of a jury's verdict must be one which would disturb a person of average sensibilities—not one of exaggerated reflexes. The standard of shock-ability depends upon normal reactions. It depends on how a person conscious of commodity prices would apply an announced amount of money to necessary purchases. These values naturally must be considered in terms of present purchasing power and not that of decades ago. *Hutchinson v. Pennsylvania Railroad Co.*, 378 Pa. 24.

The person who shocks in 1959 at what he must expend for a good meal or a night's lodging as against what he paid for the same items 20 years ago will find himself living in a state of constant concussion because the cost of everything is higher today than it was before the silver dollar began its Cape Canaveral ascent into the spiral spaces of inflation. Thus $46,000 must not be looked at through the rose-tinted magnifying glasses of 1925, or some preceding era, but through the iron-rimmed spectacles of reality of the hour. Considering that the dollar of the present, on the basis of what it was in 1940, is worth only 48 cents, it could be said that, in the light of the particular circumstances of

this case, the total verdict of $46,059.54 was modest rather than excessive.

The Trial Judge failed to state in his filed opinion how and why he was shocked at the verdict of the jury. He said that the comparison of this verdict with that returned in other cases could be but "of little assistance since each case must depend upon its own particular facts." And then, after making this assertion, he proceeded to analyze other cases in the attempt to demonstrate that the plaintiff had no cause to complain of the reduced verdict in view of what had happened in the cases referred to. While a view of other cases, of course, is always helpful, the amounts cited can very rarely be authoritative of what the verdict should be in a present case since so many shifting economic factors enter into each controversy.

The Trial Judge says that when the jury returned the verdict he was shocked but that he directed the Clerk to record it because he "felt that he would later request counsel for the parties to agree upon a verdict which was fair and reasonable." For three years the Court urged agreement between the parties and when this attempted method of disposing of the case failed, the Court entered its definitive order calling for a new trial.

There is no excuse for any further delay in paying the just verdicts rendered by the jury. The order of the Court below is reversed and it is directed to reinstate the original verdicts.

Mr. Justice BOK concurs in the result.

Mr. Justice BELL dissents.