Cooke, J.
Ice Caves Mountain, Inc., operates a large scenic park as a tourist attraction on property leased from the Village of Ellenville. During the summer months the premises are open to the public from approximately 8 a.m. until a half hour before dark on the payment of an admission fee. Although the witnesses differed on certain points, the record *236 reveals relevant events of the late afternoon and early evening of September 3, 1972.
In the late afternoon of that September day, Jeffrey Shaw-cross, a patron, walked off the main trial up the hillside and fell into a 40-foot crevice, where he remained until rescued about four and a half hours later. Another customer, 17-year-old Frederick Coutant, after hearing of the accident, went down into the hamlet of Cragsmoor and told "a couple of people” about it, among them the plaintiff and defendant Miller. These two, riding on Miller’s motorcycle, proceeded up to Ice Caves Mountain. Miller drove, plaintiff sat behind as passenger on the single seat, with his arms wrapped around Miller’s midriff and his feet on the exhaust pipes. It. was still daylight when the two arrived at the entrance. Plaintiff testified that Miller stopped the motorcycle, got off, went into the house where tickets were sold, spoke to the girl on duty, returned and the two, plaintiff and Miller, proceeded by motorcycle through the raised barrier along the mountain drive to the parking lot. After waiting about 45 minutes, plaintiff testified that he received instructions pursuant to which he carried first aid equipment and rope down to the fissure into which Shawcross had fallen. On a second trip, plaintiff testified he carried a stretcher and additional equipment, assisted a nurse and eventually helped carry Shawcross, on the stretcher, to the ambulance. Once the rescue was completed, plaintiff and Miller returned to the motorcycle, resumed the riding position as previously described and, following the road traveled on earlier, left the parking area at what plaintiff estimated to be a speed of 20-30 miles per hour. It was now 9:30 or 10:00 p.m. As the motorcycle approached a curve, plaintiff testified that it hit a series of holes, went out of control, slipped from one side of the road to the other and threw both driver and passenger out onto rocks. Plaintiff testified that he had been a summer resident of Cragsmoor for the past 16 years, had been to Ice Caves Mountain several times, that he had a 1972 season’s pass but had been there only once before during that summer.
Defendant William Miller’s testimony as to the day’s events was similar to that of plaintiff. He also testified to having a season’s pass, to making frequent trips up the mountain and to knowing the area "like the back of my hand.” Miller related his conversation with Annette Ballentine, the girl on duty in the tollhouse, stating that when he told her that he *237 was going up to help with the rescue, she answered, "Don’t. They have enough help.” To that Miller testified he responded "something like, T am going up anyway. I don’t think there is enough help. I could help anyway.’ ”
Annette Ballentine’s recollection of the events differed from that of plaintiff and Miller in that, although the substance of the conversation was the same, she testified that Miller had driven his motorcycle through the open doors and into the gift shop where she was on duty. Both Miller and his passenger remained seated on the cycle during the conversation and, at its end, after her admonition not to go up, Miller backed the motorcycle out of the shop and proceeded through the space in the gate, which she testified was not raised to permit vehicles to pass through, but lowered. This witness also testified that after learning of the Shawcross accident and prior to plaintiff’s arrival she had telephoned her boss, Fred Grau, as well as the Ellenville Rescue Squad, the Cragsmoor Fire Department and the State Police. As the summoned rescuers arrived, the witness explained that she pushed the button which raised the gate, permitting them into the premises. Although the practice may not have been always followed, there was testimony that visitors with season passes were required to stop and sign in at the gatehouse.
Fred Grau, president of Ice Caves Mountain, Inc., testified that after learning of the accident he came to the scene to direct the rescue operation but permitted the fire department to take over when the fire chief arrived with approximately 20 men. When Miller drove into the parking lot, Grau told him to move as he, Miller, had placed his cycle in the spot reserved for the ambulance.
Ralph Stedner, chief of the Cragsmoor Volunteer Fire Department, testified that of the 13 men who responded to the emergency, 8 were used and the rest sent back to the firehouse as they were not needed. The witness could recall Grau as the only "civilian” helping and, in response to questions by the court, Stedner testified that he tried to keep all of the volunteer civilians back because even though they wanted to help, they did not know what to do.
While there was additional testimony, the foregoing suffices for this review. The court charged the jury to the effect that the plaintiff’s status on the mountain was determinative of the duty of care owed to him by the defendant Ice Caves *238 Mountain. The court described the status and commensurate duties in this fashion:
"With respect to the Ice Caves Mountain, now we get into his status on the mountain. You have three options that you can find. You can find that when he was up on that mountain, he was a trespasser. That is, that he had no right to be there. If you find that he was a trespasser without any right to be on that mountain, then the duty of the people who operated Ice Caves Mountain is not to do any willful or wanton or aggressive act with respect to his safety, and I am telling you now that as a matter of law, if you find that Basso was a trespasser on that night, September 3, 1972, he cannot recover against Ice Caves Mountain * * *
"The second thing that he could have been is equivalent to a guest. That is, that he went up to the mountain to watch what was going on and that against the wishes of Miss Ballentine, under instructions from her superiors and that when he got up there, instead of being thrown out, his presence was accepted as a mere watching, as a mere observing of what was going on. In that case, Ice Caves Mountain had a duty to him which was to make sure that if there were any dangerous conditions existing on the roadway that they . should let him know. In other words, they owed him some duty not to let him get harmed because of a dangerous condition which existed on the mountain, to advise him of the conditions that may have caused him harm. That is, if he was a mere guest.
"Your third option is that if he was there for the business of the Ice Caves Mountain, that is—and the third option, there are two ways that he could have been there under the business of Ice Caves Mountain; one is that he was there as a patron; he had a season pass and he was entitled—if you believe that he had a season pass, if you believe that he had a season pass, he could have been up there as an observer under the season pass which entitled him to the use of the roadways or he could have been a rescuer helping in the rescue of Mr. Shawcross, which is the business of Ice Caves Mountain. That is, if somebody gets trapped in a crevice on Ice Caves Mountain, getting him out of there is the business of Ice Caves Mountain, and anybody who is there in assisting in that rescue is doing it for the business of Ice Caves Mountain and in those two circumstances, whether he was legally there as a patron of Ice Caves Mountain or as a rescuer, then the duty *239 owed to him is a little bit more than for the other two. Then the duty is to act—then the duty is to keep the premises in a reasonably safe condition so as to prevent anybody lawfully on the premises from becoming injured. They were under a duty to exercise reasonable care to keep the premises in a reasonably safe condition for the use of a person such as the plaintiff coming on the premises.”
Ice Caves Mountain took exception to the charge as to duty owed to a social guest or, as more frequently denominated, a licensee, claiming it placed too great a duty upon it. Ice Caves contends, and correctly so, that the New York standard has been that as a licensee a plaintiff must take the premises as he finds them, and that the owner thereof is liable only if he is found to have committed affirmative acts of negligence or if a trap existed or there was concealed danger not likely to be discovered (Krause v Alper, 4 NY2d 518; Levine v Barfus, 28 AD2d 896). There is only a duty to warn of known dangerous defects which the defendant "should know or suspect that the licensee will not discover himself after a reasonable inspection of the premises” (Velez v City of New York, 45 AD2d 887).
Based on the charge as given, the jury returned a verdict for plaintiff, on the issue of liability, and made an apportionment whereby 60% of the verdict was to be borne by defendant Miller and 40% by defendant Ice Caves Mountain. Both defendants appealed from the interlocutory judgment of liability and apportionment. Although the Appellate Division unanimously affirmed, it granted both defendants leave to appeal, certifying the following question: "Was the order of this court dated March 12, 1975 properly made?”
While several issues are raised, the one of paramount importance relates to the duty of care owed by the owner or occupier of land to one upon his property. In New York, for long, it has been the status of the plaintiff which has been determinative of the duty and, often, the ascribing of status has been a difficult task. In the instant case, for example, much of the testimony in the nearly 1,000-page record was elicited in order to enable the jury to classify the plaintiff as a trespasser, licensee or invitee. As a further complication, not only did the jury have to weigh and evaluate the differing testimony as to status at any particular time, but also had to determine whether the status of the plaintiff shifted as the afternoon turned to evening. As the trial court explained, under one view of the facts, it was possible for the jury to *240 have labeled plaintiff a trespasser when he entered without permission and against the wishes of Ms. Ballentine, a licensee when seen but not ejected by Mr. Grau, the "boss”, in the parking lot, and an invitee when assisting in the rescue. This being so, it remains a curiosity of the law that the duty owed to plaintiff on exit may have been many times greater than that owed him on his entrance, though he and the premises all the while remained the same.
Rather than to demand continued attempts to fit a plaintiff into qne of the three rigid categories, the court pauses instead to reflect, to reconsider the necessity for such classification and to state today that the distinctions need no longer be made. Taking a broad view, we note that nearly 20 years have passed since the distinctions between licensees and invitees have been abolished by statute in England (Occupiers’ Liability Act [1957], 5 & 6 Eliz 2, ch 31) and since the United States Supreme Court in Kermarec v Compagnie Generale (358 US 625, 630-631) leveled direct criticism at this aspect of tort law. In its determination that such categories have no place in admiralty law, the Kermarec court made these cogent comments (pp 630-631): "The distinctions which the common law draws between licensee and invitee were inherited from a culture deeply rooted to the land, a culture which traced many of its standards to a heritage of feudalism. In an effort to do justice in an industrialized urban society, with its complex economic and individual relationships, modern common-law courts have found it necessary to formulate increasingly subtle verbal refinements, to create subclassifications among traditional common-law categories, and to delineate fine gradations in the standards of care which the landowner owes to each. Yet even within a single jurisdiction, the classifications and subclassifications bred by the common law have produced confusion and conflict. As new distinctions have been spawnéd, older ones have become obscured. Through this semantic morass the common law has moved, unevenly and with hesitation, towards 'imposing on owners and occupiers a single duty of reasonable care in all the circumstances.’ ”
New York courts are not unmindful of the adoption of the single standard of care in several of our sister States. Beginning with the 1968 California Supreme Court decision in Rowland v Christian (69 Cal 2d 108) we have observed the growing number of well-reasoned decisions abandoning the common-law distinctions and adopting the simple rule of *241 reasonable care under the circumstances (see, e.g., Pickard v City & County of Honolulu, 51 Haw 134; Mile High Fence Co. v Radovich, 175 Col 537; Smith v Arbaugh’s Rest, 469 F2d 97; Mariorenzi v Joseph Di Ponte, Inc., 114 RI 294; compare Mounsey v Ellard, 297 NE2d 43 [Mass]). While we have demonstrated our inclination to correlate the duty of care owed plaintiff with the risk of harm reasonably to be perceived, regardless of status, and concurrently consider the question of foreseeability (Martinez v Kaufman-Kane Realty Co., 34 NY2d 819), we have not, until today,* abandoned the classifications entirely and announced our adherence to the single standard of reasonable care under the circumstances whereby foreseeability shall be a measure of liability. To be sure, this standard of reasonable care should be no different than that applied in the usual negligence action. Contributory and, now, comparative negligence, as well as assumption of the risk, all fit into their respective places, to be invoked when appropriate.
Indeed as the duty was so clearly stated in Smith v Arbaugh’s Rest, (supra, p 100): "A landowner must act as a reasonable man in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk”. Application of the single rule in the instant case exemplifies its good sense, for the duty of keeping the roads of Ice Caves Mountain in repair should not vary with the status of the person who uses them but, rather, with the foreseeability of their use and the possibility of injury resulting therefrom. While the likelihood of a plaintiffs presence had been an implicit consideration in the determination of status and the duty commensurate therewith, it now becomes a primary independent factor in determining foreseeability and the duty of the owner or occupier will vary with the likelihood of plaintiffs presence at the particular time and place of the injury. While status is no longer determinative, considerations of who plaintiff is and what his purpose is upon the land are factors which, if known, may be included in arriving at what would be reasonable care under the circumstances.
Of course, before it becomes appropriate for the jury to *242 consider all such questions, the court, as it would in the usual negligence action, must make the threshold determination as to whether the plaintiff, by introducing adequate evidence on each element, has made out a case sufficient in law to support a favorable jury verdict. Only in those cases where there arises a real question as to the landowner’s negligence should the jury be permitted to proceed. In all others, where proof of any essential element falls short, the case should go no further. While the rigid status classifications are to be dispensed with, the function of the court and the standard of proof remain the same.
The failure of the court to properly instruct the jury on the duty owed to a licensee coupled with the jury’s rendering of a general verdict, the latter making it impossible for this court to determine whether the erroneous charge was significant in the determination, mandates a reversal and new trial as to liability, wherein the standard enunciated today should be applied.
A second issue, one raised by defendant Miller, apparently for the first time on appeal, relates to his claim that the complaint should have been' dismissed as against him on the ground that the plaintiff was guilty of contributory negligence as a matter of law. Subdivision (a) of section 1251 of the Vehicle and Traffic Law prohibits a passenger from riding on a motorcycle unless such motorcycle is designed to carry more than one person. While the violation of a statute may constitute negligence or contributory negligence as a matter of law, the facts must be found proving a violation and the violation must be shown to be the proximate cause of the injury (Martin v Herzog, 228 NY 164; Ortiz v Kinoshita & Co., 30 AD2d 334, 335). Here, although the only testimony as to the capacity of the motorcycle to carry a passenger was given by plaintiff, who stated that it was a two-passenger motorcycle and described his riding position, a magazine photograph of the motorcycle, marked as an exhibit by defendant Ice Caves Mountain, showed said cycle as having one long seat. In the context of this case, the capacity of the motorcycle became a question of fact and it was for the jury to determine whether said vehicle was designed to carry more than one person. Since this issue of contributory negligence was never raised by defendant Miller, the questions relevant to its determination were never considered and the Vehicle and Traffic Law was neither requested nor charged. As there were no errors which *243 require reversal with respect to the finding of liability as against defendant Miller, that portion of the judgment was properly affirmed by the Appellate Division. However, if at the new trial there is a finding of liability as against defendant Ice Caves Mountain, then pursuant to defendant Ice Caves Mountain’s cross claim, the jury must continue their deliberations, making an apportionment.
The order of the Appellate Division should be modified so as to provide: (1) that there be striken from the judgment entered at trial term the provision that plaintiff have judgment on the issue of liability against the defendant Ice Caves Mountain, Inc., (2) that a new trial be ordered in Supreme Court, Kings County, on the issue of liability against the defendant Ice Caves Mountain, Inc., and (3) that there be an apportionment made between defendants at said new trial in the event that defendant Ice Caves Mountain, Inc., is found to be liable; and, except as so modified, the order of the Appellate Division is affirmed. The question certified is answered in the negative.

 (See concurring opns of Wachtler, J., in Martinez v Kaufman-Kane Realty Co., supra, at pp 821-822, and Mevorah v Garyn, 35 NY2d 934, 936-937.)