406 A.2d 1093

Robert CANERY

v.

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY (SEPTA), Appellant.

Superior Court of Pennsylvania.

Argued Sept. 13, 1978.

Decided June 29, 1979.

Reargument Denied Oct. 18, 1979.

Petition for Allowance of Appeal Denied Oct. 31, 1979.

Robert J. Spiegel, Philadelphia, for appellant.

Louis Samuel Fine, Philadelphia, for appellee.

Before CERCONE, President Judge, and SPAETH and LIPEZ, JJ.

CERCONE, President Judge:

A jury in the Court of Common Pleas of Philadelphia County awarded Robert Canery a verdict of $375,000 for injuries he sustained in an accident involving the Southeastern Pennsylvania Transportation Authority (SEPTA). SEPTA filed motions for judgment n. o. v. and for a new trial which were denied. This appeal followed. We affirm the decision of the lower court.

Sometime after midnight on October 16, 1969, the appellee, Robert Canery, was returning home from a visit with his aunt. He proceeded to the North Philadelphia subway station and sat down on a bench to wait for a train. Canery was suffering from a severe headache which was the result of shotgun injury he had received prior to that date. After waiting approximately twenty minutes, Canery heard a train approaching and saw the train light. He walked to within 12 inches of the edge of the platform as the train came out of the tunnel approximately 400 feet away. Canery testified he "passed out," and the next event he remembers is being in the hospital. Canery suffered a head injury, a blow to the lower back, and severance of part of one foot. Subsequent operations and treatment required the amputation of the toes on the injured foot and several skin grafts.

Walter Harrison, the conductor on a south-bound train that passed through the North Philadelphia Station after the accident, testified that he heard screams and saw a man lying on the platform. He went over to the injured man located on the platform, observed that he had been hit by a train, and then telephoned his dispatcher and the police. When the police arrived, they also found Canery lying on the edge of the platform. The officers saw his wallet and one shoe in the track area below, but no one testified that blood was found near the tracks.

According to the treating physician who testified, Canery's injured foot was covered with a lot of grease, presumably from the wheel of the train. The doctor concluded the injury to the foot was a "degloving" one whereby the skin was pulled from the bones since the foot was pinched by the subway wheel.

Jasper Pressley, the SEPTA motorman who operated the train involved in the accident, testified that he did not observe anyone either on the tracks, in front of the train, or on the platform as he proceeded through the station where Canery was injured. He said he did not hear a scream but was notified by the dispatcher at the end of the line that someone had been injured. The train operated by Pressley was a "work" train that did not stop for passengers. Pressley testified he did not stop or slow up as he passed through the station, but proceeded at a constant speed of 20 miles per hour. The manager in charge of training personnel for SEPTA testified that all motormen are instructed to slow up as they proceed through a station and give a warning signal in case anyone moves dangerously near the train on the platform or falls in front of the train.

Based on these facts, the jury found for the injured plaintiff, Canery. Appellant now asks us to review two main issues: first, whether the lower court erred in denying its motion for judgment n. o. v.; and second, whether a new trial should be granted on the grounds that the verdict was against the weight of the evidence, the verdict was excessive, and the court's charge on wanton misconduct was in error.

## I.

In our review of the denial of a motion for judgment n. o. v. it is important to note that such a motion may only be entered

"in a clear case where the evidence is insufficient to sustain a verdict against him. *Stewart v. Chercnicky*, 439 Pa. 43, 266 A.2d 259 (1970). Judgment n. o. v. is inappropriate if the evidence on a material point presented an issue of fact for decision by the jury. This method of attacking the verdict may never be utilized so as to invade the province of the jury, especially where that determination is based partly on questions of conflicting testimony and credibility of witnesses. *Brandon v. Peoples Natural Gas Co.*, 417 Pa. 128, 207 A.2d 843 (1965); *Axilbund v.*

*McAllister*, 407 Pa. 46, 180 A.2d 244 (1962). Where such questions were determined by the trier of fact, and if there is reasonable support for the verdict which was rendered, a judgment n. o. v. will not be granted . ." *Eldridge v. Melcher*, 226 Pa.Super. 381, 385–86, 313 A.2d 750, 753 (1973).

In arguing for judgment n. o. v., appellant claims that its motorman was attentively operating the work train at a reasonable rate of speed through the station and had no knowledge or reason to know of anyone on or near the tracks. Therefore, the mere happening of an accident does not raise an inference of negligence nor put the motorman's actions within the category of willful or wanton misconduct. *Kmetz v. Lochiatto*, 421 Pa. 363, 219 A.2d 588 (1966); *Flagiello v. Crilly*, 409 Pa. 389, 187 A.2d 289 (1963).

█ The issue is not as easily disposed of as appellant would suppose. Since Canery testified that he "passed out" prior to the accident, the only other person present at the scene of the accident was the motorman, Pressley, who claims he neither saw nor heard anyone. In such a situation, circumstantial evidence must be used in order to reach a reasonable conclusion. In order for the party with the burden of proof to prevail when relying on circumstantial evidence, the evidence "must be adequate to establish the conclusion sought and must so preponderate in favor of that conclusion as to outweigh in the mind of the fact finder any other evidence and reasonable inferences . . . which are inconsistent . . ." *Smith v. Bell Telephone Co. of Pa.*, 397 Pa. 134, 139, 153 A.2d 477, 480 (1959); see also *Houston v. Canon Bowl, Inc.*, 443 Pa. 383, 278 A.2d 908 (1971).

Based on the circumstantial evidence presented in this case, the parties argue that the accident could have occurred in one of two ways: first, Canery could have passed out on the platform and been hit by the moving train while on the platform. If the accident occurred in this way, the duty appellant owed Canery was that of a business visitor. A showing of negligence, or lack of due care, would then be

sufficient to find appellant liable. Second, appellee could have passed out and fallen on the tracks. The standard owed Canery in that instance is only that due a trespasser and the motorman could only be liable if there was a finding of willful or wanton misconduct. *Evans v. Philadelphia Transportation Co.*, 418 Pa. 567, 212 A.2d 440 (1955).[1]

We conclude that the weight of the evidence supports the theory that the accident occurred while Canery was on the platform. Harrison, the conductor on the train that passed through the station after the accident, and the police undeniably saw appellee on the platform. This is highly credible evidence on the part of these two participants as related to their efforts to assist Canery. The doctor who gave his conclusion as to where appellee was at the time of the accident did not observe him at the scene but merely drew his conclusion from the nature of the foot injury. However, Canery's head, back, and other parts of his body were also affected by the impact. Thus, the evidence on which the jury could base its verdict clearly supports the facts that Canery was on the platform when the accident occurred.

In keeping with this conclusion, the correct legal theory upon which the case should proceed is that of negligence. The evidence preponderates in favor of the appellee to the extent that the jury could have inferred negligence on the part of the SEPTA motorman. In the case before us, the manager of training for SEPTA testified that all motormen are to sound a warning signal and slow down as they pass through a station. Pressley's testimony of his actions was in direct contradiction to these instructions. The motorman testified that he neither sounded a warning signal nor reduced his speed when traveling through the North Phila-

---

1. "[W]illful misconduct [is] a reckless disregard for the trespasser's safety after actual knowledge of his peril . . . Wanton misconduct . . . 'means that the actor has intentionally done an act of an unreasonable character, in disregard of the risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to the consequences. . . . Prosser, Torts § 33 at 151 (2d Ed. 1955).'" *Evans v. Philadelphia Transp. Co.*, 418 Pa. at 573, 212 A.2d at 443.

delphia Station, but proceeded at a reasonable rate of 20 miles per hour. Appellant argues that 20 m. p. h. is a reasonably safe speed at which to proceed through a station and therefore it was not necessary to reduce speed. The failure to reduce speed in the face of its danger to the life or limb of another is no excuse against the charge of negligence. There was no speedometer on the train involved in the accident, and therefore the alleged speed of the train was based on Pressley's judgment and veracity. The credibility of this testimony was for the jury to determine, and the jury could have reasonably inferred a breach of the duty of due care in Pressley's failure to reduce speed or sound a warning signal.

■ Appellant's major argument is that the motorman did not see Canery even though he was attentively operating the train. However, a wrongdoer may not avoid liability by saying he did not see what was plainly visible to him. In *Kmetz v. Lochiatto*, supra, defendant, the driver of an automobile, testified he did not see the plaintiff. The court said, "The jury could find that the defendant's statement that he did not see the plaintiff before the accident, could, in itself, constitute evidence of negligence against him." 421 Pa. at 365, 219 A.2d at 589. The defendant in *Kmetz* gave no explanation of why he didn't see the plaintiff in front of his car on a well lit street when all the circumstantial evidence demonstrated that his car had hit the plaintiff. Similar language was used in *Frisina v. Dailey*, 395 Pa. 280, 282, 150 A.2d 348, 349 (1959) when the court stated:

> "A motorist, who says that he did not see a pedestrian so directly in his path that he engages him head on, places himself in the dock of accountability from which he is not released until he satisfactorily explains why his eyesight failed to tell him what was clearly visible, why his muscular reactions failed to respond to what should have been an instinctive urge to avoid doing injury to others, and what caused the lapse in the unceasing vigilance required and expected of every motorist."

This same standard is applied in railway cases. In *Peden v. Baltimore and Ohio R.R. Co.*, 324 Pa. 444, 188 A. 586 (1936), plaintiffs were struck by a freight train while walking in a spur track. The evidence showed no bell had been rung nor other warning given. The train's speed was only 5 m. p. h., but the train traveled its full length over plaintiffs' bodies before stopping. The fireman on the train testified he was watching ahead as far as he could see and did not see plaintiffs. The court affirmed judgment for the plaintiffs, saying:

> "The jury did not have to accept (the fireman's) statement that he did not see the boys, because it is a well settled principle of law based on ordinary human experience that 'one cannot be heard to say that he looked and did not see when the facts show he must have seen.'" (Citations omitted.) 324 Pa. at 447, 188 A. at 588.

In *Peden*, as in the case before us, the question is not whether the motorman was negligent in not looking because the testimony indicates he was attentively operating the train and had a clear view of the track and platform. The factual issue is whether, having looked, he actually saw what was before him. 324 Pa. at 448, 188 A. 586. The court concluded, as we do here, that the jury could have found from the evidence presented, that the motorman saw what was before him or was so dangerously close to the edge of the platform.

In the case before us, the jury was entitled to draw reasonable inferences from the circumstances presented. *Kmetz v. Lochiatto*, supra; *Frisina v. Dailey*, supra; *Peden v. Baltimore & Ohio R.R. Co.*, supra. Otherwise any tortfeasor who testifies he was looking in the direction of the victim could escape liability merely by asserting he did not see the victim. Based on the facts of the case and the above cited case law, the jury's verdict finding for appellee is supported by the evidence. An inference of negligence on the part of the motorman is more than possible under these circumstances and the motion for judgment n. o. v. was properly denied by the lower court.

## II.

In the alternative, appellant requests that we grant a new trial, first, on the ground that the verdict was against the weight of the evidence. The granting or refusal of a new trial is clearly a matter of the trial judge's discretion and his decision will not be reversed on appeal absent a clear abuse of that discretion. A new trial should not be granted on the ground that the verdict was against the weight of the evidence " 'where the evidence is conflicting and the jury might have found for either party . . .' *Carroll v. Pittsburgh*, 368 Pa. 436, 445–6, 84 A.2d 505 (1951). A new trial should be awarded on the ground that the verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." (Citations omitted.) *Burrell v. Philadelphia Electric Co.*, 438 Pa. 286, 289, 265 A.2d 516, 518 (1970).

Appellant points out the many conflicts in the testimony at trial in an attempt to establish that the accident could not have occurred as Canery and his witnesses testified. As has already been discussed in Part I of this opinion, there was sufficient evidence upon which the jury could have based its verdict in favor of the injured Canery and therefore its verdict was not against the weight of the evidence.

Next, appellant requests that we grant a new trial on the ground that the verdict of $375,000 was excessive. Once again, the duty of assessing damages is one given to the jury and their verdict will not be disturbed unless it appears an award resulted from "caprice, prejudice, partiality, corruption, or some other improper influence." *Tonik v. Apex Garages*, 442 Pa. 373, 378, 275 A.2d 296, 299 (1971).

In the case before us, appellee's medical expenses totaled $21,189 which covered six hospital stays. There was medical testimony introduced that there would be further medical expenses throughout appellee's life due to the degloving injury to the foot that occurred in this accident.

Several skin graft attempts were unsuccessful and more would be attempted. Appellee's foot continued to become infected and had to be drained periodically.

Canery's past lost earning amounted to $63,098. An actuary projected his future lost wages to be between $187,907 if he worked to age 60 and $207,444 if he worked until age 65. These figures were based on the fact that Canery was able to do some work, but in a very limited capacity. He held only a tenth grade education and could not perform any tasks that required standing more than fifteen minutes. Nor could he let his foot dangle for long periods of time due to circulatory problems.

The treating physician testified that there was much physical pain involved in the degloving injury to the foot and that such discomfort would continue. Due to appellee's young age of twenty-three at the time of the accident, the complications involved, and the additional head, ankle, rib, and back injuries sustained in the accident, the lower court concluded that an award between $83,269 and $102,806 for pain and suffering was not excessive.

Appellant did not call any medical witnesses to contradict the medical testimony at trial. As its sole argument, for excessiveness, it cites certain cases that have not awarded verdicts quite as high for similar injuries.[2]  However, as pointed out in *Spangler v. Helm's N.Y.-Pgh. M. Express,* 396 Pa. 482, 153 A.2d 490 (1959), each case must be determined on its own facts. Mr. Canery is entitled to recover for his loss of enjoyment in activities in which he had previously participated but could no longer pursue, *Lebesco v. SEPTA,* 251 Pa.Super. 415, 423, 380 A.2d 848, 852 (1977), as well as for the other elements of pain and suffering, lost wages, and medical expenses incurred incident to the accident. Only when the damages are "flagrantly outrageous and extravagant" may the court intervene and draw the line, for "they

2.  See, e. g., *Taylor v. Paul O. Abbe, Inc.,* 380 F.Supp. 601 (E.D.Pa. 1974); *Lockett v. General Electric,* 376 F.Supp. 1201 (E.D.Pa.1974); *Dorsey v. Yoder Co.,* 331 F.Supp. 753 (E.D.Pa.1971); *Welsh v. Kleiderer,* 440 Pa. 47, 269 A.2d 746 (1970).

have no standard by which to ascertain the excess." *Spangler*, 396 Pa. at 489, 153 A.2d at 493. Based on the seriousness of the injuries sustained, their continuing element, appellee's young age and limited ability to work, we conclude the damages awarded were not excessive.

■ Finally, appellant requests we grant a new trial on the basis that the trial court erred in its charge on wanton misconduct by failing to include appellant's requested point.[3] Since we have held that the weight of the evidence supports the fact that appellee was on the platform when he was injured and therefore a negligence legal theory is the correct one to be applied in this case, any alleged error in the charge on wanton misconduct would be harmless.

Decision of the lower court dismissing appellant's motions for judgment n. o. v. and for new trial is affirmed.

SPAETH, J., files a concurring opinion.

LIPEZ, J., files a dissenting opinion.

SPAETH, Judge, concurring:

I agree with my colleagues that the jury was entitled to find that appellee was injured while on the train platform.[1]

---

**3.** Appellant requested the trial judge to charge the following: "If you find that plaintiff was on the tracks, and that the operator of the train was merely inattentive, not paying attention, or inadvertent, then your verdict must be in favor of defendant." Appellant relied on *Corona v. Pittsburgh Railway Co.*, 418 Pa. 136, 143, 209 A.2d 425 (1965) for this point. Taken as a whole, the trial judge's charge on wanton misconduct was in compliance with the major cases that set forth the principle. *Evans v. Philadelphia Trans. Co.*, supra; *Moss v. Reading*, 418 Pa. 598, 212 A.2d 226 (1965); *Frederick v. Philadelphia Rapid Transit*, 337 Pa. 136, 10 A.2d 576 (1940).

**1.** Therefore the issue of whether a different duty of care is owed to a person on the tracks as opposed to a person on the platform is not pertinent to this appeal. I note, however, that the idea that "duty of care" should be defined differently, according to whether the injured person was a trespasser, invitee, or licensee, is questionable and should be reappraised. *See Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630–631, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959); *Rowland v. Christian*, 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561 (1968); *Basso v. Miller*, 40 N.Y.2d 233, 386 N.Y.S.2d 564, 352 N.E.2d 868 (1976).

Since they differ so sharply on what the jury was entitled to find on the issue of the driver's negligence, I venture here to express my own view, taking as my point of departure the principle that on an appeal from an order denying a motion for judgment n. o. v., we must regard the evidence in the light most favorable to the verdict winner. *See Community College of Beaver County v. Soc'y of Faculty*, 473 Pa. 576, 589, 375 A.2d 1267, 1273 (1977).

There was testimony that a driver driving a work train through a station was to proceed at low speed—18 to 20 miles per hour—and "be alert for anyone who may go near the ends of the platform mistaking them for a train in passenger service," and that if the driver saw someone too close to the edge of the platform or on the tracks, he was either to brake or sound a warning, or both, as the circumstances required. The driver in this case testified that he was proceeding at the required low rate of speed. He also testified that the light on his train enabled him to see some three to four car lengths ahead, or 180 to 240 feet; that the track was straight; and that the station was well lit, with the lighting such that he admitted that he "could see whatever there was to see on the platform." He further testified that as he approached the station he was looking out of the front window, and thus was in a position to view the platform.

Despite this testimony, the driver also testified that he did not see appellee, and did not know that he had hit him. The first question, therefore, is whether the jury was entitled to find that the driver should have seen appellee. If appellee was in a position where he should have been seen, the driver's failure to see him could be regarded by the jury as evidence of negligence. *See Kmetz v. Lochiatto*, 421 Pa. 363, 219 A.2d 588 (1966); *Peden v. Balt. & Ohio R. Co.*, 324 Pa. 444, 188 A. 586 (1936).

Given the evidence with respect to the location of appellee's blood stains, and the police officer's testimony that appellee was found on the platform directly across from pole number 2872, the jury could have found that appellee was

standing approximately 175 feet from the southern end of the station as the northbound train approached the station. In addition, appellee testified that he was standing only twelve inches from the edge of the platform, and that when he first saw the train approaching, it was some 400 feet away. Given this additional evidence, the jury could have found that appellee was in a position where he should have been seen by an alert driver.

In dissent Judge LIPEZ raises the possibility that appellee was hidden from the driver's view by a pillar. I grant this possibility, but I respectfully suggest that whether it materialized is speculation. In any case, I think the jury was entitled to find that a pillar did not hide appellee from the driver's view from the driver's admission that he could see "whatever there was to see on the platform," and the photographs of the station, which seem to me to show clearly enough (I put it this way because there is no scale or other proof of dimension) that the pillars were much more than twelve inches from the edge of the platform.

The next question is whether the jury was also entitled to find that an alert driver would have seen appellee in sufficient time to stop the train. The driver testified that he could bring the train to a complete stop within 80 to 90 feet. He also testified that the distance made visible by the train's headlight was 180 to 240 feet. From this evidence the jury could reason that an alert driver would have seen appellee when he was 180 to 240 feet away. The jury could further reason that this would give the driver up to five seconds to decide whether to apply his brake and 2 to 3 additional seconds to bring the train to a stop.[2] Suppose we assume that the driver could not see appellee until the train first entered the station—an assumption the jury did not have to make. From the evidence of the blood stains it would follow that an alert driver could have seen appellee when he was 175 feet away. That would still give the driver approxi-

2. This approximation is based on a calculation that a speed of twenty miles per hour amounts to just under a speed of thirty feet per second.

mately 3 seconds to decide whether to apply his brakes and 2 to 3 additional seconds to bring the train to a stop.

For these reasons I agree that we should affirm the lower court's order denying appellant's motion for judgment n. o. v.

LIPEZ, Judge, dissenting:

It is my interpretation of the record in this case that the evidence adduced at trial and the inferences reasonably drawn therefrom are insufficient to establish negligence on the part of SEPTA. At trial, the appellee, Canery, was obviously unable to show how the accident happened, and so took alternate approaches. Canery's medical witness testified, on cross-examination, that he did not know how the accident happened, and that Canery could have been injured while on the platform or in the track area.

It is axiomatic that the mere happening of an accident is not evidence of negligence; and that the plaintiff must produce evidence from which there arises a reasonable inference that the defendant was negligent; and that such negligence was the proximate cause of harm to the plaintiff. *Zilka v. Sanctis Construction, Inc.*, 409 Pa. 396, 186 A.2d 897 (1962), *cert. denied*, 374 U.S. 850, 83 S.Ct. 1915, 10 L.Ed.2d 1070 (1963). In the instant case, Canery adduced no evidence upon which the jury's conclusion that SEPTA's employee had been negligent could logically have been based; the verdict was thus the result of speculation and conjecture, and this cannot be permitted. *See Smith v. Bell Telephone Co. of Pa.*, 397 Pa. 134, 138, 153 A.2d 477, 479 (1959).

The theory that Canery was run over in the track area is so bizarre, and the chance of his escaping electrocution or injuries far more serious than those actually sustained so remote, as to exclude any reasonable likelihood that the accident occurred in that fashion. I agree with the majority, therefore, that Canery must have been injured while on the station platform.

"A court will enter a judgment notwithstanding the verdict if, and only if, viewing all the evidence (including inferences reasonably to be drawn therefrom) most favorably to the verdict winner, the elements of the cause of action or defense asserted have not, as a matter of law, been established." *Community College of Beaver County v. Soc'y of Faculty*, 473 Pa. 576, 589, 375 A.2d 1267, 1273 (1977). The evidence adduced at trial does not establish negligence on the part of SEPTA's employee. The majority declare that Joseph Boscia, SEPTA's Manager of Operational Training and Safety, "testified that all motormen are to sound a warning signal and slow down as they pass through a station[,]" and that Pressley's actions were "in direct contradiction to these instructions" and thus negligent. Boscia's actual testimony was that motormen "must go into the station at a slow rate of speed, which normally is series speed on a controller." Boscia also testified that "if they are coming into a station where they are not scheduled to stop, they must reduce speed to a slow speed, normal series, and . . . be alert for anyone who may go near the end of the platform mistaking them for a train that's in normal passenger service." The obvious import of this testimony, and of the inferences to be reasonably drawn from it, is that all trains must enter and pass through stations at a speed no greater that that designated "normal series," and that, if any train is moving faster than this speed, it must slow down to this speed before entering or passing through a station. Boscia then stated, on cross-examination, that "normal series" speed is eighteen to twenty miles per hour. Pressley testified, on direct examination by plaintiff's counsel, that the train which he had been operating had proceeded through North Philadelphia station at "[a]pproximately twenty miles an hour." Since this evidence was offered in plaintiff's case and no other evidence of speed was offered, we must conclude that Pressley was not negligent in operating his train at the time in question at that speed.

Boscia never testified that "all motormen are to sound a warning signal . . . as they pass through a station."

His testimony on direct examination concerning use of a train's horn was as follows:

> They're trained to use the horn at certain designated spots which have a W on the wall, mostly curves. They're also trained that that horn is to be used as a warning device if there is anything that's an emergency.
>
> So, if they saw someone, for example, go toward the edge of the platform, he is trained to use the horn . .

(N.T. 338.) Further, even if Pressley had sounded the horn as he neared the station, it would not have mattered. Canery testified that he had seen the train's headlight at a distance of 400 to 500 feet, and that he knew that the train was coming. Sounding the horn would have done nothing additional to alert Canery to the approach of the train. Therefore, a failure by Pressley to sound the horn 1) was not negligent because it was actually not contrary to required operating procedure by reason of Pressley's lack of awareness of any emergency situation, as discussed infra and 2) could not, in any event, have been a legal cause of Canery's injuries.

On direct examination, Boscia testified that, if a motorman sees a person in a position of danger vis-a-vis the train,

> [h]is immediate reaction that's taught is to brake the train, and he may not grab for the whistle handle at the same time, simply because with one hand he's throwing power off and with the other hand he's taking the brake. So, he actually has no hand to grab the whistle.
>
> Q. [by counsel for plaintiff] Are the utility motormen in their training told that occasionally at passenger's platforms that a passenger might involuntarily place himself on the tracks?
>
> A. Well, all people who are trained to operate in the subway are told that they may find someone in the track area some time.
>
> Q. And, in connection with that advice during their training period, what are they instructed to do because of that eventuality which might occur?

A. To first put the train into emergency, and second, to sound their horn.

(N.T. 338–39). This testimony poses the question: Was SEPTA's motorman negligent in failing to bring his train to an emergency stop? I believe that he was not.

Having failed to attempt to stop in time to avoid injuring Canery, which action would be required not only by SEPTA instructions, but by common sense as well, Pressley would have been negligent only if, in the exercise of reasonable care, he saw or should have seen Canery in a position of danger. Since Pressley's testimony as plaintiff's witness that he maintained a vigilant watch and saw no one is uncontradicted, the pivotal issue is whether Pressley *should have seen* Canery. On this question, Canery has presented no evidence, either directly or by inference.

Canery testified that, as he was standing on the platform, he saw the headlight of the approaching train at a distance of between four hundred and five hundred feet, and that he remembers nothing occurring after that until he awakened in a hospital. He was found on the platform, in an injured condition, after the passage through the station of a train operated by Pressley. It does not follow from this that, merely because Canery could see the *lights* of an oncoming train, a motorman operating that train could have seen him on the platform. While there was also testimony that the platform was well-lit, and that Pressley "had a clear view of everything that was *within his vision to see* as [he] went through the station," what actually was within his vision to see is another matter. (Emphasis added).

It must be remembered that the photographs introduced in evidence by both Canery and SEPTA show that, along the entire length of the platform, there are large pillars and staircases placed at regular and relatively short intervals. Whether Canery could be seen depended on a number of factors: his position, i. e., whether he was near the edge of the platform; if he was, was he in such a position of danger that he was or should have been seen by Pressley; if Pressley saw or should have seen Canery, did he have

*enough* warning to be able to stop; was Canery obscured by the pillars or staircases on the platform. These are some of the unanswered questions which make it impossible to draw the reasonable inferences necessary to a finding of negligence on the part of SEPTA.

Both Canery and the court below cite certain cases in support of the proposition that, given the circumstantial evidence adduced in the instant case and briefly stated above, Pressley must have been negligent for failing to see Canery and take steps to avoid injuring him. These cases, however, are distinguishable on the grounds that, in each of them, the circumstances are such that the defendant (or the defendant's employee) saw or should have seen the plaintiff in time to avoid injury.[1] Judgments n. o. v. in a defendant's favor have been sustained where the plaintiff offered no evidence, nor could any inferences be drawn from the evidence that *was* admitted, showing where the plaintiff was when struck by defendant's train. *See Anderson v. Reading Co.*, 306 Pa. 246, 159 A. 450 (1932); *Dangelo v. Pa. R. Co.*, 301 Pa. 579, 152 A. 743 (1930). Generally, judgment n. o. v.

1. *See Kmetz v. Lochiatto*, 421 Pa. 363, 219 A.2d 588 (1966) (defendant's automobile struck plaintiff head-on in a well-lighted street where there was nothing to obstruct defendant's vision); *Evans v. Phila. Trans. Co.*, 418 Pa. 567, 212 A.2d 440 (1965) (motorman of train moving at speed of 10 m. p. h. admitted seeing "an object" between the rails at a distance of 88 feet or 168 feet, and stopping distance of train at that speed was 24 to 38 feet); *Frisina v. Dailey*, 395 Pa. 280, 150 A.2d 348 (1959) (defendant, driving his automobile, struck plaintiff, a pedestrian, head-on at well-lighted intersection; no evidence of any obstruction to defendant's vision); *Peden v. Balt. & Ohio R. Co.*, 324 Pa. 444, 188 A. 586 (1936) (evidence, including photographs, clearly showed that defendant's engineer should have seen accident victims walking directly ahead along unobscured railroad track in daylight); *Williams v. Phila. Trans. Co.*, 219 Pa.Super. 134, 280 A.2d 612 (1971) (plaintiff's testimony, corroborated by that of an eyewitness, was that, when her car stalled in an intersection, she blew her horn, shouted and waved at defendant's bus which was then about 160 feet away and approaching at a speed of between 25 and 35 miles per hour; that the driver saw plaintiff's car and blew his own horn; and that the driver did not slow down although he had sufficient time to stop.)

In these cases, it may be said, there was evidence of an affirmative nature from which the inference of "should have seen" can reasonably and logically be drawn.

has been sustained where plaintiff failed to show, directly or by circumstantial evidence, exactly how the accident, which he claimed was caused by defendant's negligence, happened. *See Warden v. Lyons Trans. Line, Inc.*, 432 Pa. 495, 248 A.2d 313 (1968); *Flaherty v. Pa. R. Co.*, 426 Pa. 83, 231 A.2d 179 (1967); *Hillelson v. Renner*, 183 Pa.Super. 148, 130 A.2d 212 (1957).

In my opinion, the judgment of the court below should be reversed, and judgment *non obstante veredicto* should be entered in favor of the appellant, SEPTA.