OPINION OF THE COURT
Thomas J. Lowery, Jr., J.
In the evening of November 16,1979, Thomas Benjamin, age 11 years, was struck and injured by a puck while watching a hockey game at the Romney Arena, a State facility, located on the campus of the State University of New York at Oswego. Alleging that the State negligently failed to provide adequate protection for the safety of spectators seated in its arena, Thomas now seeks compensation for his injuries.[1]
Romney Arena, as it was laid out by the State for hockey, consisted of an oblong shaped rink that ran lengthwise in a north/south direction. It was enclosed by a dasher board that was approximately three and one-half feet in height. Two players’ benches had been placed along the easterly *72 sidelines. Elevated spectator bleachers surrounded the remainder of the rink. Goals were placed at both the north and south end. To the rear of each goal and along the sidelines, a protective fence, measuring six feet and three feet in height, respectively, was mounted atop the dasher board. The fence, however, was not continuous. In front of each players’ bench, a distance of approximately 20 feet, no protective fencing had been installed. Except for the dasher board, this area remained essentially open.
Thomas, accompanied by his brother and friends, had gone to the arena that evening to see a college hockey doubleheader. The second game was to feature the “Oswego State Great Lakers”, a local college team. They had paid their admission and had taken seats in the bleachers behind the south goal. Near the end of the first game, they left the area and proceeded to a concession stand which was located at the opposite end of the arena. After they purchased a drink, and while they were returning to their seats, they decided to view the remainder of the game from the sidelines. They found seats in the second or third row of the bleachers and sat down. When seated, they were behind the protective fence, 10 to 15 feet north of the nearest players’ bench. While there, an errant puck found its way through the open area in front of the players’ bench, passed behind the protective fence, and struck Thomas on the left side of his forehead.
The State, like any other owner or occupier of land, is only under a duty to exercise “reasonable care under the circumstances” to prevent injury to those who come to watch games played at its facilities. (Scurti v City of New York, 40 NY2d 433; Basso v Miller, 40 NY2d 233.)
In the present case, the State argues that due care required it only to provide protective seating behind the goal where the danger was the greatest. (Cf. Akins v Glens Falls City School Dist., 53 NY2d 325.) Having done so, it argues that Thomas should have remained in his protected seat behind the goal and by choosing to do otherwise, he assumed the risk of being hit by a puck. (See Ingersoll v Onondaga Hockey Club, 245 App Div 137; Hammel v Madison Sq. Garden Corp., 156 Misc 311.)
*73 The State’s reasoning is somewhat flawed, however, since it undertook to provide spectators with protected seating along the sidelines, as well. In doing so, it was under a duty to make certain that such an area was reasonably safe for its intended purpose. (Schmidt v State of New York, 198 Misc 802.)
In determining whether the State fulfilled its duty here, the court is somewhat guided by the uncontradicted testimony of the claimant’s expert, who testified to a structural defect. He testified that in similar facilities, it was the usual and customary practice to protect the area around the players’ bench. Absent such protection, it was the usual and customary practice to restrict seating to an area without the zone of danger. Since neither course of action was chosen, he opined that the State failed to provide Thomas with adequate protection that evening.
When viewing the evidence in its totality, the court finds that the absence of a fence in front of the players’ bench constituted a dangerous condition that presented a foreseeable risk of injury to those spectators, including Thomas, who were seated in the protected seating area adjacent thereto. The lack of any evidence that an accident of the same kind had happened before[2] is of no moment, since such an accident was reasonably to be anticipated. (See Barrett v Lake Ontario Beach Improvement Co., 174 NY 310.) In sum, the court finds that the failure of the State to provide for the safety of Thomas in the protected seating area constituted negligence and that such negligence was a substantial factor in bringing about Thomas’ injuries.
In addition, the court finds that the accident and the injuries sustained by Thomas were not attributable to any culpable conduct on his part. When he took his seat in the protected area on the sidelines, he had the right to assume that every reasonable care had been taken for his safety. *74 (See Barrett v Lake Ontario Beach Improvement Co., 174 NY 310, supra.) Although he admits to being aware that the area in front of the players’ bench was unprotected, it cannot be said that a reasonably prudent person of Thomas’ years, intelligence, degree of development, would have fully appreciated the danger and, hence, could have been said to have assumed the risk. (See Larson v Nassau Elec. R. R. Co., 223 NY 14; McEvoy v City of New York, 266 App Div 445.) Nor can it be said that such a reasonably prudent person should have been aware of the risk so as to be guilty of contributory negligence. (See Zurich Gen. Acc. & Liab. Ins. Co. v Childs Co., 253 NY 324.)
When struck, Thomas felt numb all over. He did not, however, lose consciousness. He was administered first aid at the facility and later taken to a local hospital where he was examined and then discharged. The following morning he awoke feeling nauseous and began to vomit. His parents immediately contacted a pediatrician, who advised them that he be taken to the Upstate Medical Center in Syracuse, New York.
Upon his arrival at Upstate, he was again examined and X-ray studies of his skull were ordered. The examination revealed a palpable depression in the left frontal area. The films confirmed that Thomas sustained, as a result of being struck by a puck, a four millimeter depressed skull fracture supralateral to the left orbit on the frontoparietal bone.
Surgical intervention followed. His head was shaved and a curvilinear incision extending archlike from approximately one inch above his left eyebrow toward his left ear was made. Burr holes in the skull were made (osteotomy). Clots were evacuated, the skull elevated, and the bony fragments were removed and replaced. The incision was sutured and a bandage was applied. He was discharged to his home on November 22, 1979.
Following his discharge, he spent the next two weeks in bed. He then was allowed to get out of bed for brief periods of time. At the end of one month, he returned to school. During the period he was home, he complained of pain and it was noted that he was having difficulty with his equilibrium.
*75 When Thomas returned to school, his activities were somewhat limited. He was compelled to wear a protective helmet from time to time, especially when taking gym. He complained of intermittent headaches.
In all, his disability continued for almost a year. Except for a surgical scar, measuring four inches in length (two and one-half inches outside of hairline), there are no permanent residuals.[3]
In view of the foregoing, the court finds that Thomas has been damaged in the sum of $24,000 (all compensatory) and an award is made accordingly.

. The derivative cause of action brought by Richard Benjamin, father of Thomas Benjamin, was withdrawn at trial. The clerk is to note its withdrawal and discontinuance of record.

. The claimant sought to introduce at trial a report of an incident that occurred on November 21,1976, when a spectator, seated behind the players’ bench, was struck by a puck. Decision was reserved on its receipt. Since details surrounding this incident were lacking, the court is unable to determine whether it occurred under conditions that were substantially the same as when Thomas was injured. Hence, the incident report will not be received. (See Richardson, Evidence [10th ed], § 196.)

. Thomas was 13 years old at time of trial. He had a life expectancy of 58.5 years. (1 NY PJI2d 224 [Supp].)