OPINION OF THE COURT
Thomas J. Lowery, J.
On March 5,1983, Joanne Davis, age 13 years, was struck and injured by a puck while watching a hockey game at the Romney Arena, a State facility located on the campus of the State University of New York at Oswego. Alleging that the State failed to provide adequate protection for the safety of spectators at its arena, the claim seeks damages for her injuries.[1]
The hockey rink ran lengthwise in a north/south direction and was enclosed with a dasher board that was approximately three and one-half feet in height. Elevated spectator bleachers surrounded the rink. Behind each goal and along the sidelines, a tempered glass protective barrier, measuring five feet and three feet in height, respectively, was mounted atop the dasher board. The extent to which the seating was protected was not defined, nor were signs posted warning spectators of the danger of being struck by a puck.
The tempered glass barrier was installed in February of 1983, approximately one month before Joanne’s accident. Prior to its installation, spectators were protected by a chain link fence that was likewise mounted atop the boards. The protection afforded by the fence, however, differed somewhat from that provided by the tempered glass. Although it was the same along the sidelines, the fence furnished an additional one foot of protection *296 behind the goals. In addition, a net had been installed behind each goal. This afforded complete protection to spectators who chose to sit in this area. The net was not removed upon the installation of the tempered glass barrier, but rather was drawn to the ceiling leaving much of the area behind the goal unprotected.
Ice hockey was a popular sport on campus, often attracting large crowds. The seating capacity for the arena was 2,400. Spectators would first seek out seats behind the goals and the players’ benches. The remainder of the seats would be the last to fill. During play-off games, attendance would exceed the arena’s seating capacity. In such cases, standing, room was provided immediately behind the dasher board that surrounded the rink.
March 5, 1983 was a play-off game at the arena. It was estimated that over 3,000 people were in attendance. Upon arrival, Joanne paid her admission fee and proceeded to the spectator seats behind the south goal, the area from which it was her custom to view the games. This was the first game she attended since the tempered glass had been installed and she was not familiar with the changed conditions. She chose a seat in the seventh row. When seated, the top of her head was approximately even with the top of the protective barrier. During the second period of the game, she was struck in the mouth by a puck that had been deflected off the goalie’s stick.
Prior to the advent of comparative negligence (CPLR art 14-A), New York courts consistently denied recovery for injuries received by spectators who had been struck by hockey pucks. (Ingersoll v Onondaga Hockey Club, 245 App Div 137; Hammel v Madison Sq. Garden Corp., 156 Misc 311; Rich v Madison Sq. Garden Corp., 149 Misc 123, affd 241 App Div 722.) In these cases, the denial of recovery was predicated on the principle that spectators, with knowledge of the dangers incident to the playing of the game, assumed the risk of being injured. Today, the aforesaid cases are relevant only insofar as they address the issue of duty owed. In each of these cases, the court agreed that the owner or proprietor of a hockey arena owed a duty of ordinary care to spectators at hockey games. (See also, Scurti v City of New York, 40 NY2d 433; Basso v Miller, 40 NY2d 233; Benjamin v State of New York, 115 Misc 2d 71, affd 96 AD2d 762.)
Pertinent to our inquiry is the scope of an owner’s duty to provide protective barriers for spectators. Does due care require the owner to enclose the entire playing surface? Are the perils of the game of hockey such that the risk of injury is imminent if he *297 does not? Although Atkins v Glens Falls City School Dist. (53 NY2d 325) involved an injury at a baseball game, it provides some guidance in defining the scope of the owner’s duty. There it was held that ordinary care required the proprietor of a ball park only to provide screening for the area of the field behind home plate where the danger is the greatest and, further, that such screening must be of sufficient extent to provide adequate protection for as many spectators as may be expected to desire such seating in the course of an ordinary game.
To be sure, there are fundamental differences in the way baseball and hockey are played, but they are sufficiently similar (see, Ingersoll v Onondaga Hockey Club, 245 App Div 137, supra; but see, Uline Ice v Sullivan, 187 F2d 82; Morris v Cleveland Hockey Club, 157 Ohio St 225,105 NE2d 419; James v Rhode Is. Auditorium, 60 RI 405,199 A 293) so as to obligate an owner of a hockey arena to provide protected seats behind each goal where the danger is the greatest. The extent of the protection afforded, however, depends on the number of spectators who may reasonably be expected to avail themselves of such seating in the course of an ordinary game. Once sufficient seats have been provided, the owner has fulfilled his duty.
In the present case, the State, in recognition of its duty, provided protection to the extent of eight and one-half feet behind each goal. The question that remains is whether more protection should have been afforded under the circumstances.[2] In this regard, the claimant suggests that the extent of the protection was clearly inadequate and that the protective netting should have been utilized since it was readily available and could have been dropped into place with little effort. The court agrees.[3] The precautions that were formerly taken are some evidence that the State was aware that more was required. (See, 2 Wigmore, Evidence § 282 [3d ed].) The State’s suggestion that the netting was used solely for the purpose of saving pucks and broken windows is unavailing. If this were the case, the netting presumably would have been used subsequent to the installation of the glass. Also of significance, is the fact that even before *298 the installation of the netting, a 14-foot to 15-foot chain link fence had been installed at the north end of the rink. The latter was sufficient to protect all of the seats at this end. In sum, the only reasonable inference that can be drawn is that the demand for protected seating encompassed the entire area behind each goal. Such is confirmed by the school’s hockey coach, who testified that the area behind the goals was the first to fill.
The State’s negligence, however, need not rest solely on the ground that the State failed in its duty to provide more protection. Due to the changed conditions, i.e., lowering the protective barrier one foot, the State was under an affirmative duty to warn spectators that the protection previously afforded had been reduced. (See, Basso v Miller, 40 NY2d 233, supra.) This is of particular importance where, as here, the spectator chose to sit at the extreme limits of the protected seating, lured there in the belief that the glass barrier was at least the same height as the chain link fence.
Accordingly, the court finds that the State was negligent and that such negligence was a substantial factor (see, Koester v State of New York, 90 AD2d 357, appeal withdrawn 58 NY2d 972) in bringing about Joanne’s injury.
In addition, the court finds that the accident and the injuries sustained by Joanne were not attributable to any culpable conduct on her part. When she took her seat behind the glass barrier, she had a right to assume that every reasonable care had been taken for her safety. (See, Barrett v Lake Ontario Beach Improvement Co., 174 NY 310.) Although she admits to having seen pucks striking the net on her previous visits to the arena and, despite her knowledge that the protection netting had been removed, it cannot be said that a reasonably prudent person of Joanne’s years, intelligence and degree of development, would have fully appreciated the danger and, hence, could have been said to have assumed the risk. (See, Larson v Nassau Elec. R.R. Co., 223 NY 14; McEvoy v City of New York, 266 App Div 445). Nor can it be said that such a reasonably prudent person should have been aware of the risk so as to be guilty of contributory negligence. (See, Zurich Gen. Acc. & Liab. Ins. Co. v Childs Co., 253 NY 324.) Finally, no culpability may be assigned for Joanne’s failure to sit in the second or third row. The view from the seats in those rows was partially obstructed not only by the dasher board, but also by spectators who were permitted to stand behind the boards that evening.
As a result of the accident, Joanne sustained a through-and-through laceration of the upper lip. She was taken by ambulance *299 to a local hospital where she was treated for the injury. Treatment consisted of debriding the wound and closing the laceration. In all, seven stitches were required. Despite the fact that the procedure employed to clean and close her wound was done under local anesthesia, it was painful. Following the suturing, Joanne was given a tetanus shot and discharged to her home. She remained home one week and then returned to the hospital where the stitches were removed. She lost one week from school.
The injury to Joanne’s upper lip has resulted in permanent scars.[4] The scar on the outside of her upper lip, measuring approximately one-half inch in length by three sixteenths of an inch in width, is somewhat cosmetically disfiguring and causes Joanne some embarrassment. It is slightly whitened, depressed, and goes against the grain of the skin. Surgical revision can improve this scar only slightly. Inside the upper lip is a raised circular scar measuring just under one inch in diameter. This scar is likened to a redundant or extra mucus membrane. The scar causes Joanne some difficulty. It catches on her braces. When this occurs, it is quite painful. Often the skin is breached and sores result. This scar can be improved somewhat surgically.
In view of the foregoing, the court finds that Joanne has been damaged in the sum of $9,000 (all compensatory) and an award is made accordingly.

. No derivative cause of action was asserted by the parents of Joanne Davis.

. The issue presented differs somewhat from that which confronted the court in Benjamin v State of New York (115 Misc 2d 71, affd 96 AD2d 762). There, the concern was with the adequacy of that which was provided, i.e., noncontinuous protective barrier.

. The question of what safety precautions should have been taken presents a question of fact. (See, Nallan v Helmsley-Spear, Inc., 50 NY2d 507.) Moreover, if the State’s decision to reduce the protection to eight and one-half feet be considered a planning decision, it certainly, for the reasons stated, lacked a reasonable basis. (See, Weiss v Fote, 7 NY2d 579.)

. Joanne was 13 years of age on the date of the accident and had a life expectancy of 66.3 years. (1 NY PJI2d 292 [Supp].)