In the Matter of the Complaint of POL-ING TRANSPORTATION CORP., as owner pro hac vice, and Motor Vessel Point Bros. No. 7 Inc., as Owner, of the M.V. POLING BROS. NO. 7, Plaintiffs,

for Exoneration from or Limitation of Liability.

No. 87 Civ. 8505.

United States District Court, S.D. New York.

May 8, 1991.

Opinion Modified on Reargument June 17, 1991.

Connell Losquadro & Zerbo, New York City (William F. Losquadro and Donna Marie Zerbo, of counsel), for plaintiffs.

Bower & Gardner, New York City (Patrick J. Kenny, of counsel), for claimants The Metropolitan Transp. Authority and The Long Island R. Co.

Fishkin and Pugash, Garden City, N.Y. (Brian Fishkin, of counsel), for claimants Ditmas Oil Associates, Inc., Racal Const. Corp., Gasteria, Inc. and Lusa Realty, Inc.

The Jacob D. Fuchsberg Law Firm, New York City (Alan L. Fuchsberg, Diane W. Bando and Bellanca S. Rutter, of counsel), for claimant Antonio Coca.

Stanley P. Danzig, New York City, for claimant David Theophilous.

OPINION

SWEET, District Judge.

The Long Island Railroad ("LIRR") and the Metropolitan Transit Authority ("MTA"), claimants in this action for exoneration or limitation of liability, have

moved for summary judgment dismissing all claims, cross-claims and counterclaims against them arising out of an explosion and fire at the Ditmas Oil Associates Terminal in Long Island City (the "Terminal"). For the following reasons, the motion is granted in part and denied in part.

## THE PARTIES

LIRR and MTA are public benefits corporations organized and existing under the laws of New York. LIRR is a subsidiary of MTA.[1]

Poling Transportation Corp. ("PTC") and Motor Vessel Poling Bros. No. 7, Inc. ("Poling, Inc.") (collectively, "Poling") the plaintiffs in this action, are New York corporations with offices in Staten Island. During the relevant time period, Poling, Inc. was the registered owner and PTC was the owner pro hac vice of the Motor Vessel POLING BROS. NO. 7 ("Poling No. 7"), a diesel-driven tanker.

Claimant Ditmas Oil Associates, Inc. ("Ditmas") is a New York corporation which manages the Terminal as a fuel storage facility. Ditmas is joined in its claim by various affiliated entities having interests in the Terminal and its fuel storage business.

Claimants Antonio Coca ("Coca") and David Theophilous ("Theophilous")[2] are individuals who were injured in the explosion and fire at the Terminal. Theophilous was employed by Ditmas and Coca was employed by one of its affiliates, Chambers Transport, Inc.

## PRIOR PROCEEDINGS

Following the accident, Coca commenced suit in the New York Supreme Court for Bronx County to recover for his injuries. On December 1, 1987 Poling instituted this action for exoneration or limitation of liability pursuant to 46 U.S.C. § 183. The various claimants responded and discovery was taken. At some point, additional state court actions were filed by Theophilous, also in the Bronx, and by various parties against LIRR in Queens County.

LIRR filed its motion for summary judgment on January 24, 1991, and oral argument was heard on March 8. Following further submission from the parties, the matter was taken under advisement as of March 18.

## THE FACTS

Except as otherwise noted, the following facts are not disputed.

The Terminal is situated in Long Island City between Newtown Creek on the south and 53rd Avenue on the north, in the vicinity of the Pulaski Skyway and the Queens entrance to the Mid–Town Tunnel. There are a number of fuel storage tanks on the premises, including two gasoline tanks, No. 27–East and No. 27–West, located at the north boundary, adjacent to 53rd Avenue.

Across 53rd Avenue to the north is an LIRR right-of-way along which run several sets of railroad tracks. In this vicinity there are four track switches which allow trains to move from one track to another. Because of their moving parts, such switches are susceptible to cold weather and must be kept from freezing. Methods used by railroads to keep switches from freezing include gas or kerosene open flame heaters, electric heaters, or chemical compounds which prevent ice build-up on the metal surfaces. For the four switches near the Terminal, the LIRR used kerosene burners, or "smudge pots," fairly simple devices consisting of a container of kerosene with a wick for lighting. The burner is placed between the railroad ties underneath the portion of the switch to be heated, and is lit manually when conditions warrant. Based on the evidence presented, it appears that the burner closest to the Terminal is at least seventy feet away, across 53rd Avenue and up a slight embankment. In addition to kerosene heat-

---

**1.** Hereafter all references to LIRR will include MTA unless otherwise noted.

**2.** Although all of the parties have treated Theophilous as a claimant in this action, there is in fact no record of his ever having filed a claim or answer to Poling's complaint. However, for the purposes of the present motion, he will be deemed to be a claimant.

ers, LIRR uses both gas and electric heaters at various locations in its rail system.

On the evening of December 27, 1986, Poling No. 7 arrived at the Terminal laden with gasoline. It made fast along Newtown Creek and at approximately 11:30 p.m. began to discharge gasoline into Tank No. 27–East. The operation continued until approximately 1:15 a.m. the following morning. During the discharge some amount of gasoline, asserted by LIRR to have been between 5,000 and 12,000 gallons, was spilled. The spilled gasoline was ignited and an explosion and fire followed in which Coca and Theophilous were injured and the Terminal and Poling No. 7 were damaged. For the purposes of the present motion only, LIRR concedes that the spilled gasoline was ignited by a lit smudge pot.

Evidence has been presented both that LIRR personnel working near the Terminal were aware that gasoline was stored there, and that Terminal personnel were aware of LIRR's use of the switch heaters. The manager of the Terminal, George Esayan ("Esayan"), testified during his deposition that he and a fire inspector had at one time discussed with an unidentified LIRR employee the possible danger of having an open flame across the street from a fuel depot, and that the fire inspector subsequently made telephone calls to LIRR on the topic. Esayan also testified by affidavit that he had on several occasions witnessed rubbish fires caused by refuse and debris around the tracks which had been ignited by the open flame of the heaters.

There was also evidence that in October 1986 a gasoline spill occurred at the Terminal, involving the release of between 150 and 200 gallons of gasoline. At that time, the street on the east side of the Terminal was blocked off to traffic while the spill was cleaned up. At oral argument, several parties stated that the LIRR suspended operations near the Terminal during the clean-up, but no evidence was presented to support this assertion. Following the spill, Esayan wrote to the Fire Department stating that Ditmas had concluded that the spill was caused by "carelessness and over-

sight of the person in charge," and that that employee had been dismissed.

## DISCUSSION

### 1. The Standard for Summary Judgment.

The standards for summary judgment are well-known. The court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Summary judgment is warranted only if "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510. It is not enough for the nonmoving party to disagree with the movant about the facts: in order to create a genuine factual issue the party opposing summary judgment must adduce evidence to demonstrate that a true dispute exists. This is particularly true with respect to those issues on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of fact exists, the court must draw all permissible inferences in favor of the nonmoving party. *Branum v. Clark,* 927 F.2d 698, 704 (2d Cir.1991). Finally,

> [a]s to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Anderson v. Liberty Lobby, supra,* 477 U.S. at 248, 106 S.Ct. at 2510.

### 2. LIRR Owed a Duty to Ditmas Not to Use Its Right-of-Way in an Unreasonable Manner.

The threshold legal question which must be addressed is whether or not LIRR had a duty to any of the parties with respect to its use of the right-of-way. As the New York Court of Appeals has stated,

Embedded in the law of this State is the proposition that a duty of reasonable care owed by the tort-feasor to the plaintiff is elemental to any recovery in negligence. Foreseeability of injury does not determine the existence of duty. Unlike foreseeability and causation, both generally factual issues to be resolved on a case-by-case basis by the fact finder, the duty owed by one member of society to another is a legal issue for the courts. *Eiseman v. State,* 70 N.Y.2d 175, 187, 518 N.Y.S.2d 608, 511 N.E.2d 1128 (1987) (citations omitted) (reversing jury verdict for plaintiff because defendant owed no duty). Of course, in New York any inquiry concerning the existence of a duty must begin with *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928), in which then-Chief Judge Cardozo stated, "Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right. 'Negligence in the air, so to speak, will not do.' ... 'In every instance, before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which would have averted or avoided the injury.'" *Id.* at 342, 162 N.E. 99 (quoting Pollock, *Torts* 455 (11th ed. 1920) and *West Virginia Cent. Ry. Co. v. State,* 96 Md. 652, 666, 54 A. 669 (1903)).

As this proposition has been expressed more recently,

> [T]he question of whether a duty exists must be analyzed in light, *inter alia,* of relevant policy concerns, including the likelihood of the injury, the scope of the burden to be imposed in guarding against it, and the consequences of placing that burden on the defendant.

*Parks v. Hutchins,* 162 A.D.2d 666, 670, 557 N.Y.S.2d 389, 393 (2d Dep't 1990) (citing *Eiseman, supra, Strauss v. Belle Realty Co.,* 65 N.Y.2d 399, 402, 492 N.Y.S.2d 555, 482 N.E.2d 34 (1985) and *Pulka v. Edelman,* 40 N.Y.2d 781, 782, 390 N.Y.S.2d 393, 358 N.E.2d 1019 (1976)). Review of these state court decisions concerning the existence of a duty leads to the conclusion that LIRR owed a duty only to Ditmas as the owner of land near the railroad's right-of-way.

In *Pulka v. Edelman,* the New York Court of Appeals addressed the question of whether a parking garage owed a duty to pedestrians walking in front of the garage's exit to prevent customers from negligently driving across the sidewalk without stopping. While agreeing that the garage could have done more to prevent such injuries, the court concluded that the ultimate responsibility lay with the driver, as the garage had no real liability to prevent its patrons from driving negligently. Moreover, the injured pedestrian was not without a remedy, as the driver was primarily liable for her own negligence. Therefore, the court concluded that the garage had no duty to the pedestrian, even though the injury might have been foreseeable:

> That in this particular case there was evidence that no significant precautionary measures were taken to prevent the negligent conduct of its patrons does not justify the imposition of any duty. Although it is reasonable to require one person to be responsible for the negligent conduct of another in some instances, it is unreasonable to impose that duty where the realities of every day experience show us that, regardless of the measures taken, there is little expectation that the one made responsible could prevent the negligent conduct.

40 N.Y.2d at 781, 390 N.Y.S.2d 393, 358 N.E.2d 1019.

Another case in which no duty was found is *Parks v. Hutchins, supra,* in which the Appellate Division reversed a jury verdict for the plaintiff against the LIRR, holding that the railroad had no obligation to ensure the absolute safety of drivers in the vicinity of its rail yards:

> Upon our review of the evidence, we discern no basis upon which the liability of the LIRR may be legally predicated.... Under the circumstances presented, it would be unreasonable to charge the LIRR with the duty of erecting a barrier capable of halting the progress of a negligently-operated auto-

mobile which has left the roadway and traversed an 11½ foot wide adjacent sidewalk.

162 A.D.2d at 670, 557 N.Y.S.2d at 393. *See also Eiseman v. State, supra* (physician filling out patient's medical history owed no duty to public at large). *Cf. Strauss v. Belle Realty Co., supra,* 65 N.Y.2d at 402, 492 N.Y.S.2d 555, 482 N.E.2d 34 (in absence of other relationship between parties there was no duty owed by defendant to plaintiff whose injuries "may have conceivably been foreseeable"); *Diven v. Hastings-on-Hudson,* 156 A.D.2d 538, 548 N.Y.S.2d 807 (2d Dep't 1989) (landowner had no duty to prevent people from entering and injuring themselves where alleged danger was "open and obvious, rather than latent").

Thus from *Palsgraf* to the present the New York courts have steadfastly refused to extend a person's duty of reasonable behavior to cover all those individuals who might be injured as a foreseeable result of the person's acts. Under the authorities cited above, there is no evidence that LIRR had any relationship to any of these claimants which would, under the applicable precedents, support a duty on its part to avoid the injury which occurred here.

■ As to Ditmas, however, the railroad clearly owed duty not to use its right-of-way in an unreasonable manner. LIRR does not dispute that a landowner generally owes such a duty to its neighbors, but argues that because the Terminal is not adjacent to the tracks but rather across 53rd Avenue it owes no duty to Ditmas here. However, the duty of a landowner not to use its property negligently does not run only to those landowners who actually share common borders. Of course, the scope and extent of the duty will diminish as the distance between parties increases, but the mere fact that there is such a distance does not as a matter of law eliminate the duty entirely. *See, e.g., Dunlop Tire & Rubber Corp. v. FMC Corp.,* 53

A.D.2d 150, 385 N.Y.S.2d 971 (4th Dep't 1976) (landowner owed duty to owner of factory on other side of railroad tracks).[3]

*3. LIRR's Use of Kerosene Switch Heaters Was Not In and Of Itself Unreasonable.*

Having determined that LIRR owed a duty to Ditmas, the next question is whether that duty was violated. As indicated in *Eiseman, supra,* this question involves matters of fact and is generally left to the factfinder's determination. *Eiseman,* 70 N.Y.2d at 187, 518 N.Y.S.2d 608, 511 N.E.2d 1128. However,

> the court, as it would in the usual negligence action, must make the threshold determination as to whether the plaintiff, by introducing adequate evidence on each element, has made out a case sufficient in law to support a favorable jury verdict. Only in those cases where there arises a real question as to the landowner's negligence should the jury be permitted to proceed. In all others, where proof of any essential element falls short, the case should go no further.

*Basso v. Miller,* 40 N.Y.2d 233, 242, 386 N.Y.S.2d 564, 352 N.E.2d 868 (1976); *accord Barnaby v. Rice,* 75 A.D.2d 179, 181–82, 428 N.Y.S.2d 973 (3d Dep't 1980) (granting summary judgment for defendant landowner based on lack of evidence of violation of duty). In order to determine whether there is a "real question" concerning LIRR's negligence, it is necessary to define the scope of its duty to Ditmas.

■ In *Basso v. Miller,* New York adopted the system in which a landowner's duty of care is measured under the single standard of "reasonable care under the circumstances where by [*sic*] foreseeability shall be a measure of liability.... 'A landowner must act as a reasonable man in maintaining his property in a reasonable safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk.'" 40

---

**3.** Poling relies on *Dunlop Tire* to support a finding that LIRR owed a duty to Poling to prevent the fire. However, in that case the defendant's own conduct was the sole cause of the explosion

which damaged the plaintiff's factory. In the present case, the primary cause of the accident was the discharge of the gasoline, for which LIRR was in no way to blame.

N.Y.2d at 241, 386 N.Y.S.2d 564, 352 N.E.2d 868 (quoting *Smith v. Arbaugh's Restaurant*, 469 F.2d 97, 100 (D.C.Cir. 1972)). Thus, one of the essential elements which the party seeking to prove a violation must show is that the injury was foreseeable.

> Whether a breach of duty has occurred, of course, depends upon whether the resulting injury was a reasonably foreseeable consequence of the defendant's conduct. ... Whether hindsight reveals that greater precautions could have been taken to avoid the harm that eventuated is irrelevant if the injury could not reasonably have been foreseen at the moment the defendant engaged in the activity which later proves harmful.

*Danielenko v. Kinney Rent A Car, Inc.*, 57 N.Y.2d 198, 204, 455 N.Y.S.2d 555, 441 N.E.2d 1073 (1982) (reversing jury verdict for plaintiff based on absence of evidence that injury was foreseeable).

■ In this case, no evidence has been presented which would support a jury verdict that LIRR could have foreseen the possibility of injury to Ditmas arising from the railroad's use of the kerosene heaters. The fact that LIRR personnel occasionally smelled gasoline fumes simply cannot constitute evidence that they should have realized that the fumes could become thick enough to ignite.[4] Esayan's testimony that he and the fire inspector pointed out the danger of the open flame burners is insufficient to constitute notice to the LIRR as the alleged "notification" consisted of a conversation with an unidentified employee with an undefined level of authority stationed at the tracks, together with uncorroborated and inadmissible hearsay evidence that the fire inspector telephoned LIRR to discuss the heaters.[5]

In addition, no evidence has been presented that there was any possibility that the controlled flame of the heaters could have ignited a fire at the Terminal in the absence of a major gasoline spill such as that involved here—*i.e.*, there is no evidence that the heaters were inherently dangerous or prone to leak or spread fire. At the very least, the lack of such evidence compels the conclusion that LIRR had no reason to believe that such an injury could occur.[6]

Therefore, in order for Ditmas to prove that LIRR should have foreseen this injury, it must show that the railroad should have expected that a major gasoline spill might happen.

Again, there is no evidence to support such a conclusion. While there was at least one prior spill, it involved less than 200 gallons of gasoline. Upon investigation, Ditmas determined that the spill was due solely to the negligence of its employee, who was discharged as a result. Nothing about this incident could constitute a reasonable basis to believe that less than three months later a second spill could occur, releasing between twenty-five and eighty times as much gasoline.

4. Indeed, Poling's counsel himself declares that "it is common sense [that gasoline] vapors can travel only so far before they are dissipated into the air in concentrations insufficient to burn." March 4, 1991 Affidavit of Brian Fishkin at 5. If this is so, then LIRR personnel who were aware of gasoline at the Terminal would have been entitled to rely on this "common sense" to conclude that the heaters were not likely to ignite the gasoline from a distance of over 70 feet.

5. Also relevant in this connection is the fact that, despite Esayan's testimony that the fire inspector considered the switch heaters to be a serious danger, and despite the affidavit testimony of Poling's fire expert George Friedell, who concluded that LIRR's use of open flame heaters was a clear violation of Fire Department regulations, the Fire Department's Inspection Report following the fire on December 29, 1986 merely recommended that the Department "[s]end a letter to [LIRR] regarding the heating of the tracks, possibly they could utilize some other heating device." Particularly in the immediate aftermath of the fire and explosion, where there was some indication that the switch heaters might have ignited the blaze, if the Department deemed the heaters to be so dangerous this "recommendation" would be expected to have been more strongly worded.

6. While Ditmas asserts that the risk of injury was "blatantly obvious," Fishkin Aff. at 4, it fails to explain exactly what the risk was, and why, if it was so obvious, Ditmas made no serious effort to convince the railroad to stop using the kerosene heaters.

Thus LIRR had no reason to expect that its heaters would themselves cause injury to Ditmas, or that a major gasoline spill which might be ignited by the heaters was so likely that the continued use of the heaters was dangerous. The continued use of the heaters was therefore not a violation of the LIRR's duty to Ditmas.[7]

*4. The Evidence of LIRR's Failure to Prevent Rubbish Fires Precludes Summary Judgment.*

█ Notwithstanding the fact that the decision to use open flame heaters was not unreasonable, summary judgment against Ditmas is inappropriate here. Esayan's affidavit testimony contains some evidence that after choosing to use open flame switch heaters LIRR did not keep the area clear of refuse and debris and did not shield the open flame of the heaters, which gave rise to rubbish fires around the heaters. Esayan stated that on occasion the wind blowing on these fires would send flaming embers flying in all directions. Although, as discussed above, there is no evidence that the use of the heaters was unreasonable, the question of whether the railroad did in fact allow rubbish fires to start and the question of whether this was behavior which created a risk of foreseeable injury to Ditmas are clearly best left to the jury.

Of course, foreseeability is only one element of the unreasonableness analysis set forth in *Basso v. Miller, supra.* The parties seeking to hold LIRR liable would also need to show, that there were reasonable alternatives to LIRR's use of the open flame heaters. The evidence presented thus far offers no real indication as to whether LIRR could or could not have used an alternate method of preventing the switches near the Terminal from freezing. The mere fact that other methods were used at other locations, while establishing that they were technically possible, does not in any way indicate whether they would have been practical alternatives for the switches in question. Moreover, in light of the preceding determination that the use of the burners was not unreasonable, and that the only evidence of unreasonable behavior is the railroad's failure to prevent rubbish fires, LIRR is entitled to prove that the most practical alternative would not have been to replace the heaters themselves but rather would have been to keep debris from collecting around or being ignited by the burners.[8]

## CONCLUSION

As a matter of law, the LIRR cannot be held to have had a duty towards any of the parties other than Ditmas. With respect to Ditmas, it was required to behave reasonably under the circumstances. Due to the absence of any evidence that the fire in question was a foreseeable consequence of the use of open flame switch heaters, the decision to use those heaters cannot be held to be a violation of the LIRR's duty to Ditmas. However, because there is evidence which could support a finding that the railroad allowed refuse to collect and start rubbish fires around the heaters, and because this behavior could be found unreasonable, summary judgment is inappropriate.

It is so ordered.

## ON REARGUMENT

### June 17, 1991

Plaintiffs Poling Transportation Corp. and Motor Vessel Poling Bros. No. 7, Inc. ("Poling") and claimants David Theophilous ("Theophilous") and Antonio Coca ("Coca") have moved to reargue a portion of the opinion dated May 8, 1991 ("the Opinion"),

---

7. Because injury arising from the use of the heaters was not foreseeable, it is not necessary to reach the issue of the feasibility of alternative devices. However, as discussed in the following section, the feasibility of other forms of switch protection is relevant to the question of avoiding the risk of rubbish fires around the tracks.

8. No evidence has been presented that the fire in question was in fact ignited by a rubbish fire rather than by one of the heaters itself. Neither the testimony of the eyewitness Theophilous nor that of the expert witnesses offers any basis for the conclusion that the fire was more likely the result of burning rubbish than the open flame on its own.

which granted in part the motion of the Long Island Railroad ("LIRR") for summary judgment. The motion for reargument is granted and on reargument the Opinion is modified.

█ The movants seek a modification of that portion of the Opinion which held that the LIRR had no duty running to any of the movants with respect to the LIRR's use of its right-of-way. The Opinion held that under New York law the LIRR could be found to have had a duty of reasonable care under the circumstances toward the nearby landowner, the Ditmas Oil Terminal ("Ditmas"), but that this duty did not extend to the individual claimants Theophilous and Coca or to Poling. Opinion at 859–861.

Based on the New York authorities cited by the movants in their papers on this motion, it appears that whatever duty the LIRR owed to the landowner Ditmas must also extend to those individuals lawfully present upon the land. *See, e.g., Russo v. Grace Institute*, 145 Misc.2d 242, 546 N.Y.S.2d 509 (Sup.Ct.N.Y.Co.), *aff'd*, 153 A.D.2d 820, 545 N.Y.S.2d 547 (1st Dep't 1989) (while landowner owes no duty to public at large, it does owe duty to individuals on adjoining property); *cf. Popper v. City of New York*, 281 A.D. 98, 117 N.Y.S.2d 335 (1st Dep't 1952). Therefore, the Opinion is hereby modified to the extent of reversing the holding that the LIRR owed no duty to Poling, Theophilous and Coca, Opinion at 861, and holding instead that the LIRR owed the same duty to these parties that it did to Ditmas.

It is so ordered.