99 N.Y.2d 247 (2002)
784 N.E.2d 675
754 N.Y.S.2d 621
FRANCISCO SANCHEZ, Appellant,
v.
STATE OF NEW YORK, Respondent.
Court of Appeals of the State of New York.
Argued October 16, 2002.
Decided November 21, 2002.
*248 John D.B. Lewis, New York City, and Gary E. Divis for appellant.
*249 Eliot Spitzer, Attorney General, Albany (Frank K. Walsh, Caitlin J. Halligan, Daniel Smirlock and Peter H. Schiff of counsel), for respondent.
Daniel L. Greenberg, Brooklyn, John Boston, Mary Lynne Werlwas; Tom Terrizzi, Ithaca, Betsy Sterling; and Alfred O'Connor, Albany, for Legal Aid Society of City of New York and others, amici curiae.
Judges SMITH, LEVINE, CIPARICK and ROSENBLATT concur with Chief Judge KAYE; Judge GRAFFEO dissents and votes to affirm the granting of the State's motion for summary judgment in a separate opinion in which Judge WESLEY concurs.

OPINION OF THE COURT
Chief Judge KAYE.
In this inmate-on-inmate assault case, appellant Francisco Sanchez's negligent supervision claim against the State was dismissed on summary judgment, on the ground that the attack was unforeseeable as a matter of law. We conclude that this record raises a triable issue as to foreseeability.
The essential facts are undisputed. On December 14, 1995, two unidentified fellow inmates in Elmira Correctional Facility, a maximum security prison, attacked Sanchez. The attack *250 occurred on the second floor of a school building the prison used for inmate evening programs. On the night of the assault, one correction officer was assigned to supervise approximately 100 inmates in the school area.[1] The officer's individual security post description, which set out his responsibilities for the evening, required him to "remain alert and monitor Inmates' Behavior * * * to prevent or stop assaults on * * * Inmates."
The officer was stationed at a desk at one end of a 60-foot long corridor, off which were six classrooms, with a storage room at the opposite end of the corridor. Perpendicular to the main corridor, near the officer's desk, was a shorter hallway leading to two additional classrooms and an open stairwell where inmates were allowed to smoke. From his desk, the officer could see down the long hallway and, by virtue of a wall-mounted mirror, he could also see down the shorter hallway. Sanchez and a civilian were in a classroom off the shorter hallway, conducting a class on Latino culture.
At the time of the attack, the inmates were all preparing for "go-back," or return to their housing units. As a leader of his class, Sanchez was required to clean up his classroom and then stand just outside the doorway to await inspection and release by the officer.
As was his routine, the correction officer at the close of classes left his desk and was at the storage room at the opposite end of the corridor, supervising inmates returning television sets and other equipment. From the storage room, he was unable to see the hallway where Sanchez was required to stand awaiting inspection. Without warning, Sanchez was punched and slashed across his face from behind with a razor-like instrument, causing a wound that required 40 stitches. The attack lasted less than 20 seconds, and the officer came to Sanchez's aid less than one minute after the attack. In his deposition, Sanchez testified that he was completely surprised by the attack and had no reason to believe he was going to be attacked.
Sanchez brought a claim against the State for negligent supervision, and the State sought summary judgment on the ground that the attack was not foreseeable. In support of his *251 claim, Sanchez submitted the affidavit of an expert witness, who opined that the State's supervision of Sanchez on the night of the assault violated generally accepted penological standards of care including the following:
 The State failed to provide "active supervision" while the inmates were in a congregate setting outside the housing area, in violation of rational and effective standards of penological supervision.[2]
 No security can be provided by one officer in a school area that has corridors of 60 or more feet in length, that has at least nine rooms (as here), that is configured so as to contain a "T" intersection which precludes total visual surveillance of the area, and that is occupied by 101 inmates.
 The officer, standing at least 60 feet from Sanchez, was not able to prevent assaults or immediately respond to emergency situations, and was not reasonably able to control the activities in the area where Sanchez was assaulted.
 "Go-back," a time of great inmate movement, is a notorious time for inmate-on-inmate assaults, and the officer positioned himself where he was unable to provide any sort of supervision.
 The officer's habitual practice of going to the storeroom during "go-back" while requiring certain inmates (like Sanchez) to remain in front of their classrooms awaiting discharge, gave the assailant an opportunity to carry out the assault.
These assertions were not disputed by the State.
The Court of Claims granted the State's motion for summary judgment and denied Sanchez's cross-motion for summary judgment. The Appellate Division affirmed, stating that in *252 inmate assault cases, proof of foreseeability essential to a negligence claim requires a showing: (1) that the State knew the victim was at risk and failed to take reasonable steps to protect him or her; (2) that the State knew the assailant was dangerous but failed to protect other inmates from him or her; or (3) that the State had both notice and the opportunity to intervene for the purpose of protecting the victim but failed to do so. In the Court's view, claimant's testimony that the attack came as a complete surprise to him itself negated notice to the State and an opportunity to protect him. Lacking proof of notice, the Appellate Division granted the State's summary judgment motion and dismissed Sanchez's negligent supervision claim. We now reinstate the claim.

Discussion
"The law is clear; it is only in its application that difficulty is encountered" (Flaherty v State of New York, 296 NY 342, 346 [1947]). That astute perception has particular resonance in the appeal before us.
A defendant stands liable in negligence only for breach of a duty of care owed to the plaintiff (see Pulka v Edelman, 40 NY2d 781, 782 [1976]). The existence and scope of an alleged tortfeasor's duty is, in the first instance, a legal question for determination by the courts (see Di Ponzio v Riordan, 89 NY2d 578, 583 [1997]). Regardless of the status of the plaintiff, the scope of the duty owed by the defendant is defined by the risk of harm reasonably to be perceived (see Basso v Miller, 40 NY2d 233, 241 [1976]). In words familiar to every first-year law student, "[t]he risk reasonably to be perceived defines the duty to be obeyed" (Palsgraf v Long Is. R.R. Co., 248 NY 339, 344 [1928]). Although the precise manner in which the harm occurred need not be foreseeable, liability does not attach unless the harm is within the class of reasonably foreseeable hazards that the duty exists to prevent (see Di Ponzio, 89 NY2d at 584).
These fundamental propositions apply with equal force to negligence claims against the State for inmate injuries sustained in assaults occurring in correctional facilities. Having assumed physical custody of inmates, who cannot protect and defend themselves in the same way as those at liberty can, the State owes a duty of care to safeguard inmates, even from attacks by fellow inmates (see Flaherty, 296 NY at 346; Restatement *253 [Second] of Torts § 320).[3] That duty does not, however, render the State an insurer of inmate safety. Like other duties in tort, the scope of the State's duty to protect inmates is limited to risks of harm that are reasonably foreseeable (see Flaherty, 296 NY at 346; Wilson v State of New York, 36 AD2d 559 [1971]).
In Flaherty v State of New York (296 NY 342), this Court directly addressed the element of foreseeability in inmate-on-inmate attacks. There, an inmate at a juvenile rehabilitation facility, during the early morning hours, had obtained a cylinder of acid from a fire extinguisher and poured it over the sleeping victim's head. The Court dismissed the victim's negligence claim against the State on the ground that the assault was not reasonably foreseeable, recognizing that the Statelike any other partyis responsible only for hazards reasonably to be perceived. As we held, there was no notice to the State that the victim was in danger, or that the assailant was dangerous, and no basis for concluding from factors such as the ratio of supervisors or the institution's experience that the State was derelict in its supervision of the inmates. "Short of constant guarding and watchingunreasonable under the circumstancesthe authorities could not have prevented so furtive and secret a deed" (id. at 346-347).
Similarly, in Gordon v City of New York (70 NY2d 839 [1987]), involving an inmate who intentionally injured himself in a holding pen, this Court reversed a jury verdict for plaintiff on the ground that he failed to establish foreseeability. In so concluding, the Court again looked to the defendant's knowledge, with respect to both the injured inmate and the institution's prior experience, determining that "the actions taken with regard to plaintiff were reasonable under the circumstances and that every possible precaution had been taken to guard against what was reasonably foreseeable" (id. at 841).
Here, the Appellate Division used a different test, requiring proof that the State actually knew that the particular victim was vulnerable to assault or the particular assailant was dangerous, or that the State actually knew that the assault *254 was about to take place and had an opportunity to intervene and protect the victim. The State urges that this test is simply a distillation of the familiar, long-established principles for determining foreseeability. We disagree.
The strict requirement of specific knowledge for foreseeability is one that has evolved recently in the Appellate Division (see Smith v State of New York, 284 AD2d 741, 742 [2001]; Stanley v State of New York, 239 AD2d 700, 701 [1997]). While it offers a bright-line test, that line redefines the traditional standard of reasonableness that has long been the touchstone of the law of negligence, and it cuts off consideration of other factors that have previously been found relevant to foreseeability.
What the State actually knew plainly falls within the ambit of foreseeability. But the Appellate Division actual notice test precludes additional consideration of the State's constructive noticewhat the State reasonably should have knownfor example, from its knowledge of risks to a class of inmates based on the institution's expertise or prior experience, or from its own policies and practices designed to address such risks (see e.g. Schittino v State of New York, 262 AD2d 824, 825-826 [1999]; Caruso v County of Suffolk, 234 AD2d 495, 495-496 [1996]; Sebastiano v State of New York, 112 AD2d 562, 564 [1985] [Levine, J.]; see also Farmer v Brennan, 511 US 825, 843 [1994]). Claimant's testimony that the attack came as a complete surprise to him cannot be the measure of the duty of the State, as his custodian, to safeguard and protect him from the harms it should reasonably foresee based on its knowledge derived from operation of a maximum security prison.
The Appellate Division test, in short, improperly modifies the test for foreseeability from what is reasonably to be perceived, to what is actually foreseen, and thus unduly circumscribes the standard of care normally due any party: reasonable care under the circumstances (see Basso, 40 NY2d at 241; Flaherty, 296 NY at 346).
Because of the procedural posture of the present appeal the question before us is a narrow one. To obtain summary judgment, the State must meet a high threshold: there must be only one conclusion that can be drawn from the undisputed factsthat as a matter of law injury to Sanchez was not reasonably foreseeable. This record will not support that conclusion. The security post description and the Correction Commission regulations (9 NYCRR 7003.2, 7003.4)drafted by the State, known to the correction officer and submitted as *255 relevant to the State's duty of carerequired that he maintain constant contact with the inmates and consistently monitor inmate behavior for the very purpose of preventing inmate-on-inmate assaults. The State itself has identified the appropriate response to a risk of assaultive conduct, and cannot now claim it was unforeseeable as a matter of law that this type of conduct would occur. Even more to the point, this record by expert affidavit identifies a risk of assault to a class of prisoners in a maximum security prison, including claimant, when they are habitually placed out of sight of any officer during a time that inmates in a congregate setting are moved between facilities, and the existence of such a risk is uncontroverted.
Addressing the dissent, we are unanimous in concluding that the State owes a duty of care to inmates for foreseeable risks of harm; and that foreseeability is defined not simply by actual notice but by actual or constructive noticeby what the "State knew or had reason to know" (dissenting op at 260), what the State "is or should be aware" of (dissenting op at 261). The requisite foreseeability is as to a "risk of harm" (dissenting op at 258, citing N.X. v Cabrini Med. Ctr., 97 NY2d 247, 253 [2002]), or "injury-producing occurrence" (dissenting op at 258, quoting Di Ponzio, 89 NY2d at 583), or "risk of an inmate-on-inmate attack" (dissenting op at 260, citing e.g. Blake v State of New York, 259 AD2d 878 [1999]).
In applying that test, however, the dissent would add to the mix, and to our law, a requirement of proof of specific notice of time, place or manner of the riskin effect, adding a fourth category of actual notice to the Appellate Division's test, rather than applying the knew-or-should-have-known standard of foreseeability on which we unanimously agree.
Nor do we open the floodgates to litigation, or require constant surveillance, by denying the State summary judgment on this record. Here, there is uncontested evidence of State rules and regulations relevant to foreseeability; uncontested evidence of an elevated risk of inmate-on-inmate attack during congregate "go-back" time; and uncontested evidence of both the regularity of the correction officer's inattentiveness at precisely that time and the officer's inability to see claimant at the location where he was required to stand.[4] Even applying the dissent's test, these combined factors should be sufficient to *256 raise an issue of fact as to constructive notice of "other indicia of unrest" (dissenting op at 262) without the necessity for specifying a particular class of inmates or naming a particular maximum security facility. Danger is danger.
We will not engage in extended discussion regarding foreseeability in public schools, hospitals or housing (see e.g. N.X. v Cabrini Med. Ctr., 97 NY2d at 253; Mirand v City of New York, 84 NY2d 44, 49 [1994]; Jacqueline S. v City of New York, 81 NY2d 288, 294-295 [1993]). We are concerned in this negligent supervision case with what risk the State, operating a maximum security prison and having custody of inmates forcibly surrounded by felonsmany of them with a proven capacity for violenceshould reasonably have foreseen in the circumstances presented.
Finally, we underscore that the State's duty to prisoners does not mandate unremitting surveillance in all circumstances, and does not render the State an insurer of inmate safety. When persons with dangerous criminal propensities are held in close quarters, inevitably there will be some risk of unpreventable assault, a risk the State cannot possibly eradicate. The mere occurrence of an inmate assault, without credible evidence that the assault was reasonably foreseeable, cannot establish the negligence of the State.
Because we conclude that there is a triable issue, the lower courts improperly granted summary judgment to the State, and properly denied claimant's motion for summary judgment. Accordingly, the order of the Appellate Division should be modified, without costs, by denying the State's motion for summary judgment and, as so modified, affirmed.
GRAFFEO, J. (dissenting).
Because we think an inmate must establish that the State had actual or constructive notice of an unreasonable risk of an attack before the inmate may sue the State for injuries sustained in an assault by another inmate in a correctional facility, and no such evidence was submitted in this case, we respectfully dissent and would grant the State's motion for summary judgment.
At the time of the incident in question, claimant Francisco Sanchez was serving a sentence of 25 years to life at the Elmira Correctional Facility, a maximum security prison operated by the New York Department of Correctional Services. Because of his good disciplinary history, Sanchez was housed in an "honor block" within the facility and was given the privilege of attending *257 evening educational and cultural programs provided at the facility's school building. Indeed, along with a civilian instructor, Sanchez taught an evening Latinos Unidos of America program in the building.
The attack occurred at the conclusion of evening programming. According to Sanchez, a total of about 60 inmates had attended the programs which were held in four or five classrooms situated along a central hall in the school building.[1] Inmates who wished to participate in programming had to pass through metal detectors before gaining access to the school building area.[2] Sixteen inmates attended Sanchez's program the evening of December 14, 1995.
As was the customary practice, when classes ended that evening the correction officer assigned to the floor opened a locked storage room located at the end of the hall and stood outside the room to supervise inmates who were returning coffee pots, television sets and other equipment used in the programs.
Responsible for ensuring that the classroom was clean before he returned to his housing area, Sanchez waited at the classroom door for the officer to check the room. Because the classroom entrance was in a small sidehall off the main hallway, the officer could not see Sanchez from his vantage point near the storage room, a distance of 60 to 65 feet away. During this brief interlude when Sanchez was out of the officer's sight line, he was attacked by one or more unidentified inmate assailants. Sanchez testified that the attack lasted no more than 20 seconds and that the officer immediately responded to his cries for help.
Sanchez stated at his deposition that he was surprised by the attack and had no reason prior to the incident to suspect *258 that he would be assaulted. Having no basis to believe he was in danger, he had never alerted authorities at Elmira Correctional Facility that he might be at risk. He also testified that he never saw his attackers and still had no idea who had assaulted him or what motivated the attack.
We agree with the majority that the State owes a duty of care to inmates confined in State correctional facilitiesand the State has never contended otherwise. The issue upon which we disagree is the scope of that duty. It is well-settled that the duty of care is bounded by the foreseeability of the risk of harm (N.X. v Cabrini Med. Ctr., 97 NY2d 247, 253 [2002]; Pulka v Edelman, 40 NY2d 781 [1976]). "Foreseeability of risk is an essential element of a fault-based negligence cause of action because the community deems a person at fault only when the injury-producing occurrence is one that could have been anticipated" (Di Ponzio v Riordan, 89 NY2d 578, 583 [1997] [citation omitted]). Once an injury has occurred, the risk becomes obvious and it is tempting with the benefit of hindsight to conclude the risk was unreasonable and the harm foreseeable. However, many activities involve inherent risks; it is only when an unreasonable and foreseeable risk of harm is disregarded that a party may be held liable in negligence.
What constitutes an unreasonable, foreseeable risk of an inmate-on-inmate assault in a prison setting? This Court has not directly addressed the nature of the duty the State owes to an inmate in a state correctional facility or the extent to which the State may be held liable on an inadequate supervision theory for an inmate attack. The most analogous case is Flaherty v State of New York (296 NY 342, 346 [1947]). There, one youth confined at a state juvenile facility attacked another by pouring acid on his face in the middle of the night. The Court observed that "[t]he Statejust as any other partyis responsible, in the operation and management of its schools, hospitals and other institutions, only for hazards reasonably to be foreseen, only for risks reasonably to be perceived" (id. [citations omitted]).[3] It ruled:

*259 "[s]hort of constant guarding and watchingunreasonable under the circumstancesthe authorities could not have prevented so furtive and secret a deed. * * * `[T]he State is held only to a duty of taking precautions against those risks "reasonably to be perceived"', and, since here no hazard was apparent, [the assailant's] act cannot give rise to liability against it" (id. at 346-347).
Similarly, this Court has previously held that an unreasonable risk of danger must be foreseeable before a lawsuit will be sustained arising from personal injuries suffered by an incarcerated inmate. In Gordon v City of New York (70 NY2d 839 [1987]), the Court dismissed the claim brought by an inmate who had attempted suicide by climbing the bars of his cell and plunging head first into the toilet. The Court observed that a duty arises to provide reasonable care to assure that harm does not occur when authorities know or have reason to know that a prisoner has suicidal tendencies or might physically harm himself. Because the plaintiff in Gordon failed to establish that the injury could have been foreseenthat the City's conduct was not reasonable in light of what could have been anticipatedplaintiff failed to establish a prima facie negligence claim.
The same duty analysis has been applied to claims by public school students arising from criminal attacks on school grounds. In Mirand v City of New York (84 NY2d 44 [1994]), the Court considered whether a public school could be liable for injuries sustained by a student who was attacked by other students. The Court described the foreseeability rule as follows:
"In determining whether the duty to provide adequate supervision has been breached in the context of injuries caused by the acts of fellow students, it must be established that school authorities had sufficiently specific knowledge or notice of the dangerous conduct which caused injury; that is, that the third-party acts could reasonably have been anticipated * * *. Actual or constructive notice to the school of prior similar conduct is generally *260 required because, obviously, school personnel cannot reasonably be expected to guard against all of the sudden, spontaneous acts that take place among students daily; an injury caused by the impulsive, unanticipated act of a fellow student ordinarily will not give rise to a finding of negligence absent proof of prior conduct that would have put a reasonable person on notice to protect against the injury-causing act" (id. at 49).
Because plaintiff had notified a teacher prior to the assault of a previous altercation on school grounds during which one of the assailants threatened to kill her, the Court concluded the jury verdict in favor of plaintiff was supported by sufficient evidence that the school had notice of an imminent danger to plaintiff. In the absence of this foreseeability evidence, the fact that the school had failed to comply with its security plan was deemed insufficient to provide a basis for liability.
Most recently, in N.X. v Cabrini Med. Ctr. (supra), this Court was asked to determine whether a hospital could be held liable on an inadequate supervision theory for its failure to protect a patient recovering from the effects of anesthesia from sexual assault by a doctor. The Court emphasized that although a hospital owes a duty of care to its patients, it is not an insurer of patient safety and is not required to keep its patients under constant surveillance. "As with any liability in tort, the scope of a hospital's duty is circumscribed by those risks which are reasonably foreseeable" (id. at 253). The Court ultimately concluded that there was a triable issue of fact as to whether the hospital could be held responsible because a jury could find that the physician's behavior prior to the incident should have alerted nurses who were standing nearby that plaintiff was in jeopardy which would have triggered a duty to attempt to prevent the assault.
Consistent with this Court's jurisprudence in inadequate supervision cases, the Appellate Divisions generally have applied a duty rule that recognizes the unique nature of prison settings and the special security and institutional concerns attendant to operating such facilities. Our courts have long applied this rule, effectively holding that the State does not breach the duty of reasonable care it owes to inmates unless the assault was foreseeable, that is the State knew or had reason to know of an unreasonable risk of an inmate-on-inmate attack yet failed to take appropriate action to ameliorate the risk or to assist the inmate once the attack was underway (see *261 e.g. Blake v State of New York, 259 AD2d 878 [1999]; Littlejohn v State of New York, 218 AD2d 833 [1995]; Colon v State of New York, 209 AD2d 842 [1994]; Padgett v State of New York, 163 AD2d 914, lv denied 76 NY2d 711 [1990]). The notice requirement accounts for the fact that it is impossible to eradicate all risks of violence within a prison setting as long as inmates are allowed contact with one another.[4] In light of this reality, although the State certainly aspires to eradicate all threats of prison violence facing inmates and correction officers, it should be liable in tort only when it fails to appropriately address unreasonable risks of attack of which it is or should be aware. Such a rule is necessary to avoid imposing insurer-like liability on the State for the criminal acts of inmates.
We agree with the majority that the rule articulated by the Appellate Division in this case too narrowly defined the types of proof that would suffice to raise an issue of fact concerning foreseeability. The Court recognized three situations: (1) where the State knew that the victim was at risk of assault; (2) where the assailant was known to be dangerous; or (3) where the State was aware of an attack but failed to appropriately intervene to assist and protect the victim.[5] While these circumstances are certainly the most common means by which actual or constructive notice is established, the list is incomplete; other types of proof would also raise a question of fact. For example, an inmate might establish foreseeability by offering proof that there were a number of prior attacks in a certain location in a facility, indicating an unreasonable risk of harm *262 particular to that place, or by demonstrating that the authorities received threats or were awareor should have been awareof other indicia of unrest prior to a certain event or program which ultimately culminated in violence.
Just because the foreseeability factors were described too restrictively, it does not follow that the Appellate Division erred in dismissing the claim in this case. Not only did Sanchez fail to offer any proof with respect to the three most common circumstances relating to foreseeability, he failed to offer any other proof from which a reasonable jury could infer the State knew or should have known that there was an unreasonable risk of violence.
Sanchez stated in his deposition that the attack came as a total surprise to him. He did not realize he had any enemies and nothing had occurred during the evening program which alerted him to a danger of attack. In support of his motion for summary judgment, Sanchez did not submit any evidence that attacks had occurred at this location in the past or even that violent incidents had previously occurred at the conclusion of evening programming. Similarly, although he included an affidavit from a penological expert who asserted generally that "[a]ssembly times are notorious periods for the occurrence of inmate-on-inmate assaults," no evidence was proffered that there is an elevated risk of violence among inmates after special programming classes. The expert's conclusory statements did not even allege the existence of an enhanced risk during assembly periods at the Elmira Correctional Facility in particular or even in New York Department of Correctional Services prisons in general. In sum, no evidence was submitted which would distinguish the circumstances leading up to this attack from those present every day at any correctional facility in New York State. If an inmate can establish a question of fact concerning the foreseeability of a criminal attack on these facts, the foreseeability requirement has effectively been eviscerated from the duty equation.
The majority focuses on the expert's general allegations of breach of dutya separate element of the negligence claim. The penological expert asserted, in conclusory fashion, that the officer failed to "actively supervise" Sanchez as required by State Commission of Correction rules[6] and contended that one officer was insufficient to supervise the number of inmates present *263 for evening programming. But the adequacy of supervision in a given situation cannot be assessed in a vacuumit must be correlated with an existing unreasonable risk of harm which the supervision is intended to ameliorate. Unless this Court is prepared to say that supervision must be constant and unremittingsomething it has expressly declined to do in analogous circumstancesliability cannot be predicated on the mere fact that the officer could not see claimant at the time of the attack but was supervising other inmates who were returning equipment to a nearby storeroom. The officer in question in this case did not abandon his posthe was attending to a legitimate security function when the assault occurred. In the absence of evidence that there was a particular danger of inmate violence of which the State was or should have been aware, the fact that the officer did not keep Sanchez under constant surveillance simply should not give rise to liability.
In conclusion, we cannot countenance this expansion of state liability for personal injuries caused by the criminal acts of inmates. Nor can we ignore the anomaly created by the majority's holding, which allows this claimant to proceed to trial in circumstances where a schoolchild or hospital patient who was the victim of a similar sudden attack would be foreclosed from doing so.
Order modified, etc.
NOTES
[1] Whether five dozen or eight dozen inmates were congregated in the area (see dissenting op at 257 n 1) is not material to our conclusion. The "master callout sheet" lists well over 100 inmates signed up and authorized to attend classes that evening (see also 288 AD2d 647). The number 60 was Sanchez's guesstimate. The number of inmates gathered together outside their housing unit when claimant was attacked was, in any event, large.
[2] The State Commission of Correction Minimum Standards and Regulations for Management of County Jails and Penitentiaries require that when prisoners are participating in activities outside housing areas, the responsible staff shall maintain "active supervision," which consists of the "uninterrupted ability to communicate orally with and respond to each prisoner * * * [and] the ability * * * to immediately respond to emergency situations" (9 NYCRR 7003.2 [c] [1], [3]; 7003.4). Although these regulations apply to county jails and penitentiaries, not state prisons, the expert concluded that they are relevant in establishing a reasonable standard of supervision, and they are thus also relevant to our foreseeability analysis.
[3] Sebastian v State of New York (93 NY2d 790 [1999]) in no way undermines Flaherty's holding that, in its operation of prisons, the State owes the same duty of reasonable care as any other party (dissenting op at 258-259 n 3). Sebastian addressed an entirely different situation: whether, absent a special relationship, the State can be liable to a private party injured by a juvenile who escaped from a detention facility. Herejust as in Flahertythe injured party was in the State's custody.
[4] We all agree that "liability cannot be predicated on the mere fact that the officer could not see claimant at the time of the attack * * *" (dissenting op at 263). That is not the issue in this case.
[1] Although Sanchez's expert was asked to assume that there were approximately 100 students in attendance, this assumption is not substantiated by record proof in evidentiary form. Sanchez testified at his deposition that there were about 60 inmates in the vicinity. Although Sanchez referenced a callout sheet in his attorneys' affidavits which would indicate that, if every inmate who participated in programming had attended that evening, the total would approximate 100, that document does not establish that all inmates were actually present that evening.
[2] Sanchez's expert assumed that inmates attending evening programming did not have to pass through a metal detector. The only admissible evidence in the record is to the contrary. The correction officer who supervised the area unequivocally stated that inmates had to pass through metal detectors before they were allowed access to the school building area. Sanchez did not contradict this testimony and no other evidence from any party with a basis of knowledge supports the expert's assumption.
[3] In Flaherty the State's duty was likened to that of any other party, but this Court has since recognized that, insofar as it manages facilities which house inmates for the protection of the public, the State is not like other litigants. In Sebastian v State of New York (93 NY2d 790 [1999]), the Court held that the State's supervision of a juvenile incarcerated at a Division for Youth facility was a quintessentially governmental function for which the State was protected by broader immunity than a private litigant would enjoy. This conclusion was fortified by policy considerations, including the possibility that imposing tort liability would interfere with the State's pursuit of rehabilitation as a goal and would instead lead to more restrictive custodial supervision of facility inmates to reduce the risk of liability. Although the State has not argued here that it is immune from suit, many of the policy concerns underlying the immunity cases inform our conclusion in this case.
[4] While tort liability is often used as a tool to deter misconduct in other settings, it is an ineffectual instrument for addressing the delicate security and other interests which authorities must assess in determining the appropriate degree of autonomy within the prison setting to provide inmates like Sanchez who have behaved well enough to earn the privilege of attending evening programming. Prison officials are faced with the unenviable task of balancing the risk of inmate attack arising from contact between inmates against the significant role such interactions play in maintaining inmate morale and, in some cases, furthering the important goal of rehabilitation.
[5] The majority in this Court characterizes these categories as requiring proof of actual notice in every case. We disagree. Certainly, authorities would be on actual notice if they received information regarding a threat that a specific inmate would be attacked at a certain time or place. However, proof that a particular inmate was vulnerable because he was about to be transferred or had been attacked or targeted for violence in the past, for example, would constitute only constructive notice of a risk of attack, yet it would fulfill the first circumstance identified by the Appellate Division as a basis for liability (see e.g., Sebastiano v State of New York, 112 AD2d 562 [1985]).
[6] As the expert acknowledged, the rules were not promulgated by the Department of Correctional Services, the agency which operates the state prison system, and apply only to county jails. Even if the rules applied to this correctional facility, they do not mandate either constant visual surveillance of inmates or the continuous occupation of a security desk in any area other than a facility housing area. Indeed, beyond the requirement that security posts in housing areas be manned at all timesirrelevant here since the attack did not occur in a housing area"active supervision" involves maintaining an uninterrupted ability to communicate orally with and respond to each prisoner, visually observing each prisoner at least once every 30-minute interval and being able to immediately respond to emergency situations (9 NYCRR 7003.2 [c]; 7003.4 [a]). Even viewing the facts in the light most favorable to claimant, he failed to allege a lack of "active supervision" here since it is undisputed that the correction officer was always in a position to communicate orally with Sanchez, his visual contact was only interrupted for a brief period, and the officer immediately responded to Sanchez's cries for help. 9 NYCRR 7003.3, which applies by its terms solely to "[s]upervision of prisoners in facility housing areas" similarly provides no basis for imposing liability here.