CB v Howard Sec. (2018 NY Slip Op 00087)





CB v Howard Sec.


2018 NY Slip Op 00087


Decided on January 4, 2018


Appellate Division, First Department


Acosta, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on January 4, 2018
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Rolando T. Acosta,P.J.
Sallie Manzanet-Daniels
Judith J. Gische
Barbara R. Kapnick
Marcy L. Kahn, JJ.


350345/12 4859 

[*1]CB by His Mother and Natural Guardian Lateaqua Suarez, et al., Plaintiffs-Respondents-Appellants,
v
Howard Security, et al., Defendants-Appellants-Respondents.



Cross appeals from the order of the Supreme Court, Bronx County (Julia I. Rodriguez, J.), entered on or about November 29, 2016, which denied defendants' motions for summary judgment dismissing the complaint as against them and plaintiffs' motion for summary judgment on the issue of liability and for a spoliation charge.



Carroll, McNulty & Kull LLC, New York (Frank J. Wenick of counsel), for Howard Security, appellant-respondent.
Mauro Lilling Naparty, LLP, Woodbury (Matthew W. Naparty and Kathryn M. Beer of counsel), for Sammon-Build Center Housing Development Fund Corporation and Tolentine Zeiser Community Life Center, appellants-respondents.
Philip Newman, P.C., Bronx (Paul Bibuld and Michael Karnes of counsel), for respondents-appellants.



ACOSTA, P.J.


Plaintiff and his mother, plaintiff Lateaqua Suarez, were living in a domestic violence shelter owned and operated by defendants Sammon-Build Center Housing Development Fund Corporation and Tolentine Zeiser Community Life Center (collectively, Sammon). Defendant Howard Security had been hired to provide, among other things, security for the residents of the [*2]shelter. On November 8, 2011, CB was being returned to the shelter by his father, Bobby B., when a man later identified as Mauricio Acosta approached Bobby B. for his jacket. Acosta pulled a gun, and in the ensuing struggle, the gun discharged, striking CB and leaving the four-year-old boy paralyzed from the waist down.
CB and his mother commenced this action against Sammon and Howard Security, alleging that defendants breached their duty of care to CB by failing to bring him into the premises to safety. The motion court denied both plaintiffs' and defendants' motions for summary judgment. We agree that material issues of fact exist. We modify solely to grant plaintiffs an adverse inference charge for defendants' failure to produce the security guards' log book.
Facts and Procedural Background
Sammon's "Statement of Client Rights and Client Code of Conduct" require that all children be in their units with a reasonable responsible adult by 9:00 p.m. This requirement was reiterated in the "Operating Rules," which stated that residents were responsible for the safety of their children and that children must have adult supervision at all times. Residents who knew their children would be outside the premises following curfew were required to obtain permission from Sammon's director.
"Security Post Orders" provided for two "fixed stations of surveillance," the guard booth and the indoor surveillance area. Two guards were to be on duty at all times, one stationed in each location. The guards rotated positions every hour. The guard in the booth in front of the premises was not permitted to leave the booth while on post. Clients were required to sign in and out of the premises. Children were not allowed to exit the site alone, even to see an adult whom they claimed was waiting for them, without the head of household (HOH) escorting them out of the gate. When entering, children were required to stop at the security gate to find out if their parent was at home. If the parent was there, the child could proceed to the unit, except that children under 10 were required to wait to be picked up by their parent. If the parent of a child under 10 was out, the child was permitted to wait in the recreation room. After office hours, guards were required to telephone on-call staff for instructions. The Security Post Orders also provided that if a child was in close proximity to a fight, the guard could "make a judgment call and attempt to move the child out of harm[']s way."
CB's mother (Suarez) testified that on the date of the incident, CB had been visiting with his father, Bobby B. for the evening. Bobby B. brought CB back to the shelter around 9:30 p.m., after curfew. Suarez received a call from the security guard asking her to pick up CB at the gate. Suarez responded that she was taking care of the baby and would be "down in a few." Suarez looked out the window and saw Bobby B. and CB standing outside the gate.
The security guard called Suarez again to remind her that CB was waiting downstairs. She repeated that she was caring for the crying baby and would be down later. Approximately five minutes later she went downstairs to retrieve her son.
When she arrived downstairs, Suarez saw Bobby B. and Acosta grappling with each other up against the gate, next to the guard booth. CB's hand was pressed against the locked gate;
one guard "was walking out of the booth and the other [guard] was just in the booth." Acosta's gun discharged, and the bullet struck CB.[FN1]
Acosta testified that he approached Bobby B. with his gun drawn and told Bobby B. to give him the jacket. Bobby B. refused, reached for the gun, and began wrestling with Acosta. During the struggle, the gun discharged, and CB was struck by the bullet.
Crystal Standish, the shelter's director, testified that Sammon had entered into a contract with Howard Security to provide security for the premises. The guards were unarmed and were not to intervene in any altercations outside of the building. Standish described Howard Security's responsibilities as generating incident reports; signing clients into and out of the site; giving them their keys when they entered and taking back their keys when they exited; noting the number of children the client returned with, particularly if any were missing; responding to clients' calls for assistance, and doing rounds: vertical and inner and outer perimeter. Standish noted that these rounds were especially important overnight since there was no maintenance staff on duty from 12:00 a.m. to 8:00 a.m. The guards might have to correct a hazardous condition such as liquid on the steps.
Standish testified that she told the guards that in the event of an altercation they were not to get physically involved. There were no written guidelines or rules in effect requiring the guards to open the gate for children if they appeared to be in harm's way outside the gate; Standish described it as a "judgment call."
Standish further testified that the day after the incident she reviewed the footage taken by the security cameras outside the gate. The video showed four men following Bobby B. and CB along the street around the corner from the shelter; one of the men went across the street to act as the point man, two others hung back, and the fourth, later identified as Acosta, walked past Bobby B. and CB and went to the corner. It seemed to Standish that about five minutes passed from the time the video depicted CB and his father being followed to the time when Acosta stopped at the corner. She could not see what happened after that.
Howard Security's principal, Cheryl Howard-Tyler, testified that her company was responsible for securing the premises itself, but not the public sidewalk outside the premises or beyond pursuant to a contract. Indeed, the guards were not supposed to look for any kind of criminal activity outside the building, and were not required to go outside the premises to confront a crime that was occurring on a public thoroughfare, nor were they required to let a minor resident through the gate after 9:00 p.m. without his or her parent or another responsible adult even if they perceived the child to be in danger. Howard-Tyler stated that no City or State entity had ever told her that the security she had in place was insufficient.
Esumail Konneh, one of the security guards on duty the night of the incident, testified that during their shifts, the guards at Sammon generally remained in a security booth just beyond the gate; from the booth, guards were able to see people outside. The guards were the only individuals with access to the electronic control within the security booth that opened the gate and they determined who would be permitted through.
Konneh testified that the guards were responsible for regularly patrolling the premises, both inside and outside. External patrols were performed solely to ensure that the interior of the premises was safe; a guard would circle the outside to make sure the that fire escapes and windows were secure and that nonresidents were not trying to gain access to the shelter. One guard always remained in the booth.
According to Konneh, men were not allowed on the premises. When men brought their children back to Sammon, the mothers would have to come and get the children. The guards would not allow a child through the gate until the child was claimed by the mother or guardian. The guards were not to take responsibility for any child waiting for a parent.
Konneh testified that on the date of the incident, he and his coworker, Joshua Fofie, were in the security booth when Bobby B. approached. Bobby B. asked Fofie to ring Suarez to ask her to come downstairs for CB. Konneh never heard Bobby B. ask Fofie to let CB through the gate. Konneh said that he never discussed the incident with Fofie afterwards.
Konneh did not recall seeing another individual immediately outside the gate other than Bobby B. and CB and did not observe anyone approach Bobby B. or exchange words with him.
Plaintiffs moved for summary judgment, arguing that defendants had failed in their duty to provide minimal protection to shelter residents by not protecting CB from a known risk of harm. They contended that the security guards were acutely aware of the presence of real and immediate danger to CB. Plaintiffs also sought a charge of spoliation of evidence because defendants failed to produce either the surveillance video from that night or the guards' log book.
Plaintiffs submitted an affidavit by Bobby B. saying that on the night of the incident, he and CB were walking along the street on the way to the shelter when he saw that they were being followed. Bobby B. claimed that when they reached the security gate, he asked the guards to let CB in because of the danger, but instead the guards called Suarez to get CB. Bobby B. said that while he and CB were waiting for Suarez, Acosta tried to involve Bobby B. in a conversation about his jacket, asking if he was from the neighborhood and saying that he had never seen Bobby B. around there before. Bobby B. said that he chose to ignore him, and Acosta walked back across the street to stand with his friends.
Bobby B. claimed that he then asked the guard to let CB inside the gate and call Suarez a second time. He said that he told the guards that he was about to have a problem because of the threatening way the men were acting and the fact that they had followed him and CB. The guards called Suarez a second time but did not open the gate. Bobby B. claims that he then saw Acosta "put his hood up over his head" and walk toward him and CB. Bobby B. asked the guards again to open the gate, but they did not.
Bobby B. said that Acosta then came very close to him and demanded his jacket. He refused and told Acosta to leave him alone. Acosta then pulled out a gun and placed it against Bobby B.'s chest. Bobby B. grabbed for the gun, and as the two struggled, a bullet discharged, striking CB.
Plaintiffs also submitted an affidavit by Konneh, who asserted that "generally" children were let inside the gate after their mothers were called. Konneh further stated that Fofie, his fellow security guard, saw the altercation between Bobby B. and Acosta as it was happening. Konneh stated that it was unclear to him why Fofie did not allow CB inside, and claimed that he would have let CB in.
Defendants, by separate motions, moved for summary judgment, arguing that they did not owe CB a duty of care to protect him from criminal acts of third parties outside the shelter premises. Defendants further argued that even assuming a duty existed, they did not breach it since they performed their duties in a manner completely consistent with their approved policies and procedures forprotecting against foreseeable criminal acts.
Sammon submitted an affidavit by an expert public safety consultant who concluded, after reviewing the evidence, that not even an armed and trained police officer would have been able to prevent CB from being shot.
The motion court denied all three motions for summary judgment, including plaintiffs'request for a spoliation charge.
Analysis
Summary Judgment
Plaintiffs argue that Sammon owed CB a duty under the common law pertaining to landowners and the regulations pertaining to domestic violence shelters [FN2]. "In order to prevail on [*3]a negligence claim, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom'" (Pasternack v Laboratory Corp. of Am. Holdings, 27 NY3d 817, 825 [2016] [quoting Solomon v City of New York, 66 NY2d 1026, 1027 [1985]). "In the absence of a duty, as a matter of law, there can be no liability" (id.).
With respect to the common-law duty, landowners have "a duty to exercise reasonable care in maintaining [their] . . . property in a reasonably safe condition under the circumstances" (Galindo v Town of Clarkstown, 2 NY3d 633, 636 [2004]; see Basso v Miller, 40 NY2d 233, 241 [1976]), which includes taking minimal safety precautions to protect against reasonably foreseeable criminal acts of third persons (Jacqueline S. v City of New York, 81 NY2d 288, 292-295 [1993]).
We reject defendants' contention that they had no common-law duty to CB because the shooting took place outside the building, i.e., because CB was on the street side of the gate. Plaintiffs raised issues of fact as to whether the security booth, gate, and recessed area that CB was standing in were part of the shelter property and not the public sidewalk. However, even if CB was not standing on shelter property, it cannot be said that under any circumstance Sammon owed no duty to him.
Indeed, none of the cases relied on by Sammon for this proposition involved the circumstances of plaintiffs' version of events: security guards declined/refused to let a child resident who was in obvious physical danger enter the premises. In Vega v Ramirez (57 AD3d 299 [1st Dept 2008]), a fight spontaneously erupted outside a nightclub and the plaintiff's "own testimony established that he could have remained within the safety of the nightclub . . ., yet he elected to go outside and join the fight" (id. at 300). CB, on the other hand, was trying to enter the safety of the building to get away from the danger he faced outside. Matter of Bailey v City of NY Hous. Auth. (55 AD3d 443 [1st Dept 2008]) is distinguishable because the decedent was shot while walking between buildings in the complex, not while standing at the gate in front of the manned security booth. In Ward v New York City Hous. Auth. (18 AD3d 391 [1st Dept 2005]), the plaintiff was shot in open and public space outside his building. As noted above, CB was at the security gate and his father asked several times for the security guard to let CB in. In Evans v 141 Condominium Corp. (258 AD2d 293 [1st Dept 1999]), the plaintiff was attacked just as she was about to open the door to the building, where she knew there might be no doorman stationed at that time. In Martinez v New York City Hous. Auth. (238 AD2d 167 [1st Dept 1997]), a shot fired from a vacant lot across the street entered through a bedroom window and struck the plaintiff. The fight that resulted in CB's injury occurred immediately in front of the building while security guards were on duty and in contact with CB's father. In Levya v Riverbay Corp. (206 AD2d 150, 153 [1st Dept 1994]), the plaintiff was assaulted on an obscure secondary outdoor walkway of a sprawling residential complex of more than two square miles, not standing in front of a security gate in the presence of guards.
There are also issues of fact as to Howard Security's duty of care. Howard argues that its contractual agreement with Sammon did not create any duty to CB. Howard contends that it was retained by Sammon to perform specific, limited tasks on the premises, namely patrolling and generating reports, and because of those limited duties, CB was not a third-party beneficiary to the contract. Plaintiffs argue that CB was an intended third-party beneficiary of Howard's security contract with Sammon or that Howard launched a force or instrument of harm, i.e., that [*4]it triggered an exception the rule against imposing liability on a third-party contractor (see Espinal v Melville Snow Contrs., 98 NY2d 136, 140 [2002]).
"It is well established that contractual obligations impose a duty only in favor of the promisee and intended third-party beneficiaries" (253 E. 62nd St., LLC v Moluka Enters., LLC, 151 AD3d 489, 490 [1st Dept 2017]).
"A party asserting rights as a third-party beneficiary must establish (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost" (State of Cal. Pub. Employees' Retirement Sys. v Shearman & Sterling, 95 NY2d 427, 434-435 [2000] [internal quotation marks omitted]).
"[The] identity of a third-party beneficiary need not be set forth in the contract or, for that matter, even be known as of the time of its execution, . . . the intention which controls in determining whether a stranger to a contract qualifies as an intended third-party beneficiary is that of the promisee, . . . and . . . where . . . a genuine issue exists as to the parties' intention to benefit another, a triable issue of fact is presented which is not appropriate for summary disposition" (MK W. St. Co. v Meridien Hotels, 184 AD2d 312, 313 [1st Dept 1992] [internal citations omitted]).
The contract between Sammon and Howard provides, in relevant part, "Whereas, Owner is . . . desirous of obtaining the services of the Contractor for the protection of persons and real and personal property at the aforementioned Premises. . . (emphasis added), "7. Contractor shall provide unarmed uniform guards to perform the services set forth in this paragraph and Schedule A hereto." Schedule A identifies "Patrol Area" as "Sammon Build Center[,] 2294-96 Grand Avenue[,] Bronx, New York 10468," and lists the "PROFESSIONAL SERVICES TO BE RENDERED [as] Patrol site on a routine basis[,] Generate tour reports[,] Generate incident reports[,] Generate upgrade reports[,] Generate intelligence reports, Generate monthly reports[.]"
Although the contract clearly provides that CB is an intended third-party beneficiary, there are issues of fact as to the benefits that CB is entitled to under the contract. It should be noted, however, that allowing a child in danger to enter the shelter does not appear to be in derogation of any rules prohibiting unarmed guards from intervening in an altercation. Indeed, as the Post Security Orders indicate, the guards are vested with discretion in certain situations. For example, the rules state, as indicated above, that if a security guard sees a child in harm's way during a fight, the guard may make a judgment call and attempt to move the child out of harm's way. In fact, Standish herself testified that she had told the guards that if they saw a child in harm's way, "[Y]ou take that child and move that child to a safe distance and have your partner come stand with that child, call the police." Defendants make much of the fact that the guards were unarmed. However, a guard does not have to be armed to press a button that opens a gate.
There are also issues of fact as to whether any defendant breached its duty and whether the breach was a proximate cause of CB's injuries. As the motion court noted, the facts surrounding the incident are not clear. The duration of the incident must be determined to establish whether there was an opportunity to permit CB to enter the premises safely before the shooting. The question whether the security guards perceived any potential danger to CB, and if so, why they did not alert plaintiff mother, must be determined. In the absence of electronic surveillance capturing the incident, the case hinges on the credibility of the witnesses and participants and their testimony. This determination must be one for the factfinder.
Spoliation
Although the court providently exercised its discretion in denying the part of plaintiffs' motion that sought a spoliation charge with respect to surveillance video, plaintiffs should be [*5]granted an adverse inference charge if the case proceeds to trial for defendants' failure to produce Howard's log book or for the failure to create a log book in the first instance as requried by the parties contract (see e.g. Arbor Realty Funding, LLC v Herrick, Feinstein LLP, 140 AD3d 607 [1st Dept 2016]; see also Strong v City of New York, 112 AD3d 15, 24 [1st Dept 2013]). We leave it to the trial court to fashion the language in conformity with the evidence adduced at trial.
Accordingly, the order of the Supreme Court, Bronx County (Julia I. Rodriguez, J.), entered on or about November 29, 2016, which denied defendants' motions for summary judgment dismissing the complaint as against them and plaintiffs' motion for summary judgment on the issue of liability and for a spoliation charge, should be modified, on the facts and in the exercise of discretion, to grant plaintiffs' motion for a spoliation charge to the extent of permitting an adverse inference charge at trial for defendants' failure to produce the log book in question, and otherwise affirmed, without costs.
All concur.
Order, Supreme Court, Bronx County (Julia I. Rodriguez, J.), entered on or about November 29, 2016, modified, on the facts and in the exercise of discretion, to grant plaintiffs' motion for a spoliation charge to the extent of permitting an adverse inference charge at trial for defendants' failure to produce the log book in question, and otherwise affirmed, without costs.
Opinion by Acosta, P.J. All concur.
Acosta, P.J., Manzanet-Daniels, Gische, Kapnick, Kahn, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JANUARY 4, 2018
CLERK



Footnotes

Footnote 1:Acosta was convicted, upon his plea of guilty, of assault in the first degree and sentenced to a prison term of 15 years.

Footnote 2:The parties characterize the Security Post Orders respectively as mandatory governmental rules and internal guidelines. To the extent they are internal rules that set a standard higher than the common-law duty of care, their violation cannot be a basis for imposing liability (see Gilson v Metropolitan Opera, 5 NY3d 574, 577 [2005]). To the extent they are governmental regulations, issues of fact exists as to what they require or permit.